**Tallulah MORGAN et al., Plaintiffs,**

v.

**John J. KERRIGAN et al., Defendants.**

**Civ. A. No. 72–911–G.**

United States District Court, D. Massachusetts.

Dec. 16, 1975.

Laurence Fordham, Boston, Mass., J. Harold Flannery, Cambridge, Mass., Foley, Hoag & Eliot, Boston, Mass., Robert Pressman, Eric E. Van Loon, Center for Law & Education, Cambridge, Mass., Marian Wright Edelman, Valerie Vanaman, Timothy Spofford (Children's Defense Fund), Cambridge, Mass., for plaintiffs.

Philip Tierney, James F. Sullivan, Matthew T. Connolly, DiMento & Sullivan, Boston, Mass., for School Committee.

Richard W. Coleman, Segal, Roitman & Coleman, Boston, Mass., for School Administration.

Sandra Lynch, St. Board of Education, Boston, Mass., for State Board of Education.

Thayer Fremont-Smith, Choate, Hall & Stewart, Boston, Mass., for Boston Home & School Assoc. intervenors.

Timothy J. Wise, Asst. Atty. Gen., Boston, Mass., for Commonwealth of Mass.

Marilyn L. Sticklor, City of Boston Law Dept., Rm 615, Boston, Mass., for City of Boston & Mayor.

Charles R. Parrott, Edward F. McHugh, Jr., Nutter, McClennen & Fish, Boston, Mass., for Superintendent of Schools.

John F. McMahon, Angoff, Goldman, Manning, Pyle & Wanger, Boston, Mass., for Boston Teachers Union.

Pamela A. Taylor, Mass. Chapter of National Lawyers Guild, Cambridge, Mass., Richard J. Hiller, Puerto Rican Legal Defense Fund, New York City, for El Comite de Padres intervenors.

SUPPLEMENTARY FINDINGS AND CONCLUSIONS ON PLAINTIFFS' MOTION CONCERNING SOUTH BOSTON HIGH SCHOOL

GARRITY, District Judge.

On December 9, 1975 the court entered various orders on plaintiffs' motion for further relief concerning South Boston High School, following a week of evidentiary hearings which ended on November 28, including an order that the school be placed in temporary receivership. On December 9 the court dictated numerous findings of fact and conclusions of law upon which its orders were based, but time did not permit the statement of all of the court's findings and conclusions and it was stated that these additional ones would follow. The court believed that the need for the orders entered on December 9, especially the moratorium on appointments to key positions by the lame duck school committee, was urgent and could not await a complete contemporaneous memorandum of decision. The findings which follow deal principally with conditions observed by the court on two visits to South Boston High School and its determination that a change in the leadership and programs at South Boston High School is essential to implementation of the student desegregation plan dated May 10, 1975, in particular the provisions at pages 1–4.

The legal underpinnings of the court's orders appear in its memorandum of decision dated June 5, 1975, especially the parts entitled "Preventing Continuing Injury" beginning on page 29 and "Multiplicity of Measures" beginning on page 39. The court also relies upon the legal precedents and principles cited in the August 1975 report of the United States Commission on Civil Rights on desegregating the Boston public schools, at pages 62–64.

With the court-appointed experts, who are the Dean and Associate Dean of the Boston University School of Education, and his law clerk, the court made two unannounced visits to the school, the first on Wednesday November 26, 1975, and the second on December 2, staying at the main building from about 7:30 a. m. to 9:30 a. m. on the first visit and from about 10:15 a. m. to 11:30 a. m. on the second. On November 26 the court spent about a half hour at the L Street Annex after leaving the main building. Attendance at the main building on No-

vember 26, which was the day before Thanksgiving, was reported to be 271 white, 106 black and 25 other minority students, for a total of 402. On December 2 the reported figures were 337 white, 146 black and 27 other minority, for a total of 510.[1]

On both visits the court was taken on a complete tour of the building by the Assistant Headmaster for mathematics and looked in on classrooms, met teachers and students and observed students changing classes. On the first visit the court witnessed the entrance of students through the metal detecting devices which have been set up in the lobby of the school. On the second visit the court saw students at lunch at three of the six daily cafeteria sittings. The court met and spoke briefly with several administrative aides and law enforcement personnel and other personnel at the school, including the nurse, cafeteria employees and clerks. The number of State Police troopers stationed inside the school was approximately 90, of whom 2 were black. The number of transitional aides was approximately 42, of whom 15 were black.

The central impressions of the court as a result of its visits were that the services being afforded the students were primarily custodial and only incidentally educational and that the situation in the school was characterized less by racial tension, or indeed by any sort of tension, than by a pervasive lassitude and emptiness.

At an evidentiary hearing on the afternoon of the court's first visit, the court described the small numbers of students in many of the main building's 29 standard classrooms and 27 other learning stations such as shops, gyms and laboratories. On our second visit we counted 8 classrooms which were completely empty, of which only 2 were empty due to their being in the process of remodeling. More than half the remaining classrooms appeared to contain 6 or fewer students.

The reported total attendance on December 2 was 510. However, making allowance for between 30 and 40 mechanical drafting students who were away from school on a field trip, the court and its law clerk and the two experts were in agreement that the number of students in attendance was substantially overstated. As for teachers, the roster of names and addresses filed by the defendant school committee at the outset of the hearing on plaintiffs' motion lists 100 teachers and 6 administrators. However, nowhere near 100 teachers could be found on the premises during the court's visits. On the second visit, when 99 teachers including 6 substitutes were carried on the roll, we made an unsuccessful effort to locate clusters of teachers not then teaching or present in corridors, storerooms, shops or laboratories; only a total of ten teachers were in the two teacher lounges at the time. Additionally, some classes were being conducted not by teachers but by aides, thus further reducing the number of teachers to be seen. During the testimony, a faculty meeting on October 22 was described and it was stated that about 40 faculty members were in attendance. This testimony corroborates the court's impression that on both visits the number of teachers listed in the teachers roll as being in attendance on those days was substantially overstated.

In the classrooms, with perhaps a half dozen exceptions, an inconsiderable amount of instruction appeared to be in progress. Granted, some aspects of teaching are impossible to observe or gauge in a brief visit and the court did witness observable instruction in progress in some classes, such as chemistry and the sheet metal shops. However, in most classrooms there was no dialogue between teachers and students nor test-taking in progress and most students appeared to be paying little if any

---

1. On November 18, 1975, as to which the defendants had filed, previous to hearing the plaintiffs' motion, a detailed breakdown of attendance by race, grade and sex, attendance at the main building was 371 white, 139 black and 30 other minority, for a total of 540.

attention to the teachers.[2]  In several classrooms students were found standing, or seated on desks or tables, rather than at their desks or in chairs.  We observed a student in the front row of a classroom with his head on his forearm, apparently sleeping, and saw him in the same position a minute or two later, although his teacher was in the front of the room within a few feet.  Many students appeared to be without books or other teaching materials.  The boys' gym class on both visits consisted of from three to six boys shooting baskets at a basketball hoop at either end of the gym.  On the court's second visit, a substitute teacher was present in the boys' gym, who said he was helping the aide with the class.  Despite the availability of empty classrooms, students on study periods were sent to one of the two low-ceilinged, basement cafeteria rooms where about ten were observed seated at picnic-type tables, on attached wooden benches without back supports, while cafeteria workers were setting out food at the counters at the end of the room.  On the first visit a few students were in the library, and on the second there was but one student, who was being tutored by a Youth Service volunteer.

Everywhere but in the classrooms, laboratories and shops, security personnel predominated.  State troopers, efficient and impressive, were in every corridor.  Transitional aides generally stood around doing nothing, except that some sat outside lavatories presumably to protect students wishing to use them.  Aides need have no particular qualifications, not even a high school diploma, and have had no special training but for a talk or two; they wear no uniforms; with few exceptions the white aides, who outnumber the blacks by more than two to one, come from South Boston and the black aides come from areas in Community District 6 from which the black students are bused.  Administrators and teachers who were not in classrooms also stood about the corridors keeping a watchful

eye on the students.  A number of other personnel were present, such as volunteer tutors and employees of the Youth Activities Commission.  Except for the State Police, who were ready but not uneasy, the corridor contingent acted as if trouble were expected.  At one point we ascended a staircase quickly and met two aides at the top of the stairs, obviously anxious and alert; one explained that the sound of quick footsteps on the stairs was cause for alarm.

Generally speaking, except for the special needs and bilingual classes, the whole place was devoid of the youthful spontaneity that one associates with a high school.  It was not just a matter of students of one race not speaking to or paying attention to students of another race, but of their saying little and seeming to pay little attention to fellow students of the same race.  The students appeared to be calm compared to many of the non-uniformed personnel; nor did they seem inclined to exchange hostile glances or prone to take offense.  They simply seemed to be the victims of constant cynical surveillance, unconcerned, uninvolved and cowed.

The court's visit to the L Street Annex, a remodeled wing of a municipal bathhouse to which about two-thirds of the ninth graders have been assigned, was too brief to warrant detailed findings and conclusions.  Generally it showed considerably more vitality than the main building, with dialogue or demonstration or test-taking or other learning process observable in most of the classrooms that we had time to look in on.  Another difference was that security personnel were not omnipresent.

Turning to findings apart from the court's observations on its visits to the school, attendance at the main building is lower than at any other high school in the city.  As of October 17, 1975, 891 students had enrolled at the main building, 542 white, 315 black and 34 other minority.  Of total enrolled students, only 61% attended on November 18, 1975

these are the indicia he uses in determining whether education is going on.

(a sample day for which complete breakdowns by grade, race and sex were filed), 45% on November 26 and 57% on December 2. The percentage of enrolled white students who were in attendance exceeded the corresponding percentage of black students on all three days: November 18, 68% of enrolled white students attended, and 44% of blacks; November 26, 50% of whites and 34% of blacks; and December 2, 63% of whites and 47% of blacks. The breakdowns by grade for November 18 showed that the lower the grade, the lower the percentage of enrolled students in attendance, as follows: 9th grade 39%, 10th 59%, 11th 65% and 12th 73%. Evidently students in their early years at South Boston High were being "turned off" in greater numbers than those closer to graduation, and black students more so than white.

Other figures paint an even darker picture. The 891 students now enrolled at South Boston High School comprise but 70% of the 1280 students initially assigned to it, the lowest percentage of projected student enrollment actually enrolled at any high school in the city. Similarly, actual attendance as a percentage of actual enrollment at the South Boston High School main building, is usually only 60%, a figure lower than any district high school, lower than all but Boston Trade High School, and substantially below the citywide figure of 86%. Furthermore, figures appearing in the preamble to a plan for a department of school security services filed by the superintendent on November 26 show that the main building at South Boston High School has the highest rate of student suspensions of any school building in the city, 357 suspensions per 1000 students during the two months of September and October, 1975. The L Street Annex has the second highest rate—297 suspensions per 1000 students, compared with the average suspension rate at all high schools in the city, including South Boston High School, of 47 suspensions per 1000. Total suspensions at both South Boston High buildings equalled nearly 49% of all suspensions of high school students in the system. This combination of the highest suspension rate and the lowest attendance rate invites an inquiry whether suspensions are ordered at South Boston High School more readily and automatically than at other high schools and, as a result, students are deterred from attending school.

South Boston High School remains an identifiably white school, especially at the main building where administrative personnel, including assistant headmasters, librarian, nurses, building custodians, clerk-secretaries, attendance supervisors, and cafeteria managers and attendants—a total of approximately 45 persons—do not include a black or other minority employee. Of the total of approximately 90 state police troopers stationed inside the school, 2 are black. Of 100 teachers, 7 are black including 2 physical education teachers and the music teacher—the school has no band or orchestra.

The white identifiability of South Boston High School is also shown by the 1975–76 handbook, received in evidence as exhibit 31, that is given to every student and mailed to the parents of all registered students. From its opening sentence on page 3, "South Boston High School opened its doors to students of the Peninsula area in September, 1901", to its concluding sentences on page 44, "Dogs are a nuisance and a potential danger to all. They do not belong on school premises.", it is clear that in the opinion of the administration the school belongs only to the white students residing in the easterly part of the district which it serves. Nowhere is reference made to the fact that the school is in a period of transition from an all-white school to one to which black and other minority students have been assigned because new district lines have been drawn and it is the only high school serving the district in which they reside. Nowhere do the words "black" and "Spanish speaking" appear except in a bald description on page 43 of Multi-Ethnic Councils in terms of their having been

ordered by the United States District Court, District of Massachusetts. The opposite page describes the high school Home and School Association and sings its praises in extravagant terms, as follows, "All families are welcome to join the Home and School Association . . [which] sponsors activities and programs of both a social and educational nature during the school year. . . . Members of the Home and School Association are urged to take an active part in school affairs that are of mutual concern to parents and the faculty of the school. Officers of the Home and School for the year 1975–76: President, Mr. James Kelly [and two other offices and names]." The implication of the handbook is that the high school's Home and School Association is a parent-teacher type organization interested in the high school curriculum and activities. Actually, membership in the Association is open not only to parents but also to "friends" of the school and, of the 14 officers and executive board members of the Association, only 2 are parents of children enrolled in the school! Its principal if not exclusive activity for the past two years has been opposition to the court's desegregation plan. Together with the South Boston Information Center, whose purpose is to correct distortions in news about public schools released by the school department and printed in the daily press and whose president happens to be the same Mr. Kelly, the Association has sponsored white student boycotts in violation of state law. See Mass.G.L. c. 76, § 4. Plaintiffs have shown *prima facie* that the Association[3] is a homeowners' or taxpayers' group concerned about things other than the content and quality of the education being offered at South Boston High School.

The school is surrounded by evidence of racial hostility. The word "Resist" is written in large lettering with white spray paint on the south doors of the main building, and the word "Never" is written with black paint in one to two foot lettering on one wall of the L Street Annex. The word "Nigger" is written in one foot letters with white paint on a lamppost on the street adjacent to the school. Racial slurs are painted on the pavement at most street intersections near the school. Virulent handouts have been distributed to white students en route to school, e. g.,

"WAKE UP AND START FIGHTING FOR YOUR SCHOOL AND TOWN. ITS TIME YOU BECOME THE AGGRESSORS . . . DONT BE SCARED BY THE FEDERAL OFFENSE THREATS. A FIGHT IN A SCHOOL ISNT A FEDERAL OFFENSE . . . BE PROUD YOU ARE *WHITE* AND FROM SOUTHIE AND SHOW EVERYONE THAT THIS IS HOW YOU ARE GOING TO KEEP IT NO MATTER WHAT."

When a black assistant football coach, a former outstanding player, was temporarily assigned to the school in an aborted effort to integrate the all-white football team, a handout was addressed to the players stating in part,

"They make fools out of you by FORCING you to accept a Black Assistant Coach which is part of their plan to take our school. But worse than that you make fools out of Southie and you don't care. If you cared at all or had any Balls you would demand they get rid of the Black Coach and you wouldn't play until they did at least you'd be doing your part."

White parents who have not shunned organizations, e. g., Racial Ethnic Parents' Councils, established by the court to ease racial tensions have been threatened and intimidated by repeated slashings of the tires on their automobiles, bricks thrown through windows of their residences, etc.

---

**3.** The Association described is the South Boston *High School* Home and School Association and is to be distinguished from the Home and School Association of South Boston, which is part of an alliance of district associations which has participated constructively in these proceedings, represented by Thayer Fremont-Smith, Esquire, and whose president, Mrs. Marie Clarke, serves on the executive committee of the Citywide Coordinating Council appointed by the court.

At the conclusion of the evidentiary hearing on plaintiffs' motion, the court dictated to the court reporter various findings on events in South Boston related to desegregation of its public schools, in the form of adoption of specified paragraphs of factual allegations made in the motion. Repeating them in this memorandum would serve no purpose.

The student desegregation plan ordered in these proceedings on May 10, 1975 provided at page 2, "There shall be no segregation of students within schools, classrooms or programs in the school system", and at page 3, "All extra-curricular activities and athletic programs shall be available and conducted on a desegregated basis." Yet racial segregation persists at South Boston High School. Detailed oral findings were made in open court on December 9 regarding the unsuccessful efforts of black students to join the football team; they will not be repeated. Black students, all of whom are bused, must enter school in the morning before white students are allowed in. There is no administrative policy as to seating arrangements in classrooms, the matter being left up to the individual teacher, so black students all sit on one or the other side of the room or all toward the front or rear. A plan to have desegregated assemblies, by having homerooms sit in assigned rows, is, according to the only testimony as to its implementation, not being enforced. Students of separate races sit at separate tables in the cafeteria at lunchtime; no effort is made to "break the ice" between the two groups such as by having teams of white and black aides eat together; on the contrary, a black girl taking a seat at a cafeteria table at which some white girls were already seated was reprimanded by the building administrator for having made a "provocative move." The black girl had previously testified that she did this because there was no room for her at an adjacent table at which her black friends were seated. When fights or disturbances occur, participants are sent to segregated "holding rooms" located off the main lobby of the building. These rooms, in effect isolation cells, are approximately fifteen feet long and eight feet wide with ceilings ten to twelve feet high. There is a row of four to six chairs permanently affixed to the floor in each room, with folding seats. There are no windows. The large, single door to each room is solid wood and is cut into independent top and bottom sections. During classes, only the bottom half is closed. Between classes, both sections are closed and the students within have no visual contact with the corridor. The air inside the holding rooms is stale and, especially in the white holding room, is permeated with odors from the gymnasium underneath. While both white and black students are sent directly to the holding rooms following infractions of school discipline, white students who are suspended may leave the building and walk home. Black students, on the other hand, are confined, sometimes for hours, until a ride to the westerly side of the district becomes available. At the end of the school day at 1:50 p. m., black students must clear the school and depart on their buses before the white students may emerge.

Part of the problem at South Boston High School has been the attitude of the faculty as a unit toward the changes that have accompanied desegregation. Without question, many individual teachers have performed superlatively under the most harrowing circumstances and their students and the community will be forever indebted to them for their dedication and fortitude. As a unit, however, the faculty has, in Dr. Reid's phrase, felt "put upon" by desegregation, and this attitude has impeded integration of the school. The details of one such instance follow. On October 9, the day after the black students caucused, presented a list of grievances and refused to leave their buses, the Citywide Coordinating Council (CCC) established from its membership an integrated, five-member mediating board designed to help resolve disputes and ease tensions. The services of the mediating board were offered to South Boston High

School in a meeting with Dr. Reid and the faculty senate on October 14. The faculty senate voted three to two to recommend the services of the board to the entire faculty. On October 16 the full faculty tabled the question of accepting the offer of the mediating board and invited the board to meet with the faculty on October 22. On that day, the board members appeared but no action was taken by the faculty, only forty of the approximately 100 faculty members having come to the meeting. On October 23, the proposal to accept the mediating board's services was rejected at a meeting attended by from 70 to 75 faculty members. On Friday morning, October 24, heavy fistfighting broke out in the worst racial confrontation of the school year; racial violence had erupted at a football game the previous afternoon. The students were dismissed during the noon hour and the building administrator called a meeting of the entire staff. The following partial account of the meeting appears in an affidavit[4] filed by a young but well experienced and credible white substitute teacher who attended the meeting:

> "I reported to the office and was told that I should attend the faculty meeting at 1:00 p. m. I went to the faculty lunch at 12:30 p. m. In the lunchroom I observed that white teachers were laughing and engaging in mock fights among themselves while the black teachers present appeared subdued. We all went to the auditorium for the faculty meeting. Dr. Reid stated that he was to meet that day with Dr. Fahey and he was sure that he would be asked for the faculty's opinion on closing the school. A discussion of problems at the school ensued. I was surprised that there was no discussion of the racial nature of the incidents of the day. A black teacher stood up and suggested that

there should be more black teachers, administrators and aides in the school. His demeanor was non-belligerent. After he spoke a white teacher spoke against his position stating that 'qualified' people should be hired. At least half of the white teachers began to cheer loudly at this point in apparent response to the position taken by the white teacher. Another black teacher (or aide) stated that he had witnessed what he considered police brutality against black girls. A white teacher stood up to dispute this, stating that there were no such incidents. Again there was a great response from the white teachers, who cheered the white teacher's position. The only times that there were loud or vehement responses during the meeting came after black teachers offered their suggestions and were contradicted by white teachers. The whole tone of the meeting was whites against blacks."

The outcome of the meeting was a vote, 26–24, to decline the assistance of the mediation board on the basis that its procedures were not sufficiently explicit.[5]

During the same period in October, school department headquarters sought to help alleviate the racial tensions which were erupting at South Boston High School. On October 10, the day after organization of the CCC mediating board, the associate superintendent of schools for planning and the member of the department's office of implementation in charge of programmatic concerns designated an instructional support team to help out at the high school. Such teams had met with success at the middle school level. But when the team leader met with the faculty on October 21, assistance from headquarters was rejected on the basis that the proposals were too vague.

4. The substitute teacher, Kenneth R. Brociner, testified; but his testimony has not yet been transcribed. Hence this use of his affidavit, which was filed pursuant to the court's notice of hearing that plaintiffs' motion would be heard mainly on affidavits. Mr. Brociner's tes-

timony was consistent with the statements quoted from his affidavit.

5. However, on the second day of hearings on plaintiffs' motion, the faculty voted to reverse its position and to cooperate with the CCC mediating board.

It is possible that, if the CCC mediation board or school department support team had been permitted to help, the major disturbance on October 24 might have been avoided. The faculty's rejection of assistance from two quarters during a time of aggravated racial tension in the school, even after widespread violence occurred among students on October 24, raises doubts whether, as presently constituted, the faculty intends to act as a unit to promote implementation of the court's desegregation plan at South Boston High School. The president of the faculty senate testified at the hearing that he had not read the plan and knew of no discussions by the faculty of Racial-Ethnic Parent Councils (RPCs) and their student counterparts (RSCs), whose establishment the court ordered on October 4, 1974. It may be significant that South Boston High had a 100% white student body and a 99% white faculty for many years before the court's orders in these proceedings. In all likelihood many members of the present faculty were initially assigned to South Boston High School by virtue of contractual transfer rights that were exercised at a time when the school was all white. Only 7 of the 100 faculty members assigned to the main building at South Boston High School and 5 of the 24 teachers assigned to the L Street Annex reside in South Boston. The delicate matter of teacher transfers will be considered further by the court during the pendency of the temporary receivership. The defendants school committee and superintendent have been ordered to cooperate. Some voluntary transfers may be made, and some involuntary, in any case without loss of compensation or seniority.

The declining attendance at South Boston High School, the atmosphere at the school and its effect on education, the school's continuing racial identifiability, the persistence of racial hostility and segregation, and the reaction of the faculty as a unit, raise at least two questions: have the adverse developments at South Boston High School been inevitable and is the situation hopeless? In the court's opinion, the answer to both questions is "No." The court's plan established agencies for community participation and support whose potential has scarcely been tapped at South Boston High School: multi-ethnic parent and student councils, a community district advisory council and council of principals, a citywide coordinating council and staff, and links with the University of Massachusetts, Gillette Company Safety Razor Division and the Federal Reserve Bank. An educational planning group for South Boston High School comprised of educators from the University of Massachusetts and twelve teachers and administrators from the high school had several meetings during June and July 1975 and in August submitted a formal, 23-page report containing specific recommendations and proposals for South Boston High School in five general areas: orientation, staff morale, curriculum, career education and discipline. Most of its recommendations have not been acted upon by the administration at South Boston High School, e. g., modified clustering of students so that corridor traffic between classes is reduced; tutoring, laboratories and teacher workshops for students with reading and mathematics skills below grade level; and special programs including guidance counseling, psychological services and alternative programs for disruptive students. In August 1975, school department headquarters issued a so-called "Green Book" of general guidelines as to safety and security, recommending that school administrators "make provisions to provide buses one hour after dismissal to allow more participation in activities, and for discipline purposes." The transportation office received requests for late buses for these purposes from other schools, at the high and middle levels, but no request from South Boston High School for late buses except for athletics, which are practically the only form of extracurricular activity. An elaborate reporting system was set up for the reporting of non-violent racial incidents such as racial chants and slurs; but nothing was

done about the reports. They were not investigated, assertedly because of a lack of trained investigators. In open court on October 14, the court was told of efforts at South Boston High School to form "a biracial team of retired law enforcement officers who are skilled in carrying out investigations so that they may review the many filed which exist." The reports are still not being investigated, and there is little point to filling one out. There have been no regularly scheduled faculty meetings and no regularly scheduled student assemblies.

It is not too late for changes at South Boston High School during the current school year. For example, modified clustering of students could be instituted, at least on an experimental basis. Qualified guidance counsellors for both individual and group counseling appear to be needed urgently and they could be put to work at any time. Teaching and course programs can be revised so as to place more students in classes of normal size instead of having handfuls of students in rooms that can comfortably accommodate three or four times as many. Flexible program scheduling might be instituted with the assistance of guidance counsellors and data programmers specializing in educational programming, who can be found in the greater Boston area. Extracurricular activities can be expanded to enhance opportunities for increased understanding between students sharing common interests. An established workable grievance procedure would enable students to report grievances and, if valid, have action taken with respect to them. Changes can be made and announced to students and parents other than in response to crises. Their principal purpose would be to make the school more attractive to students who are enrolled in it but not currently attending.

Up to now there has been an almost total preoccupation at South Boston High School with preventing and controlling outbreaks of violence among students. Little has been done to identify and counteract the causes of students'

racial tension and frustration and to insulate the school from the rising winds of racial hostility that swirl around it. Here a sharp distinction must be drawn between racial hostility and non-violent opposition to the court's desegregation plan on the ground that it provides for student assignments to schools beyond walking distance. The latter is the right of every citizen with which the court will never interfere. It is quite different, however, from intimidating black students by unprintable racial slurs and signs and handouts from seeking an education in the only school to which they have been assigned through no fault of their own. Affirmative action and imaginative initiative are required to integrate a school that has always been 100% white. At South Boston High School the preconditions to affirmative action have not yet been established. The main purpose of the temporary receivership ordered on December 9 is to see to it that they are.

The most difficult issue involved in deciding the relief to be ordered on plaintiffs' motion is whether the required changes can occur under the leadership of its distinguished headmaster of the past decade, Dr. William J. Reid, and his team of loyal administrative assistants. The court has come to the firm conclusion that they cannot. We re-emphasize a finding stated orally on December 9: at no time did Dr. Reid intentionally discriminate against any student on account of his race or on any other improper or unworthy basis. The court's decision on this issue rests on findings of fact previously made and on the following five additional findings: (a) In addressing the faculty at the beginning of the school year, Dr. Reid stated in substance that the usual educational concerns would have to be subordinated during the coming school year to problems of discipline and security. (b) During his testimony Dr. Reid was asked about a report that South Boston High School was the only high school in the city whose students did not respond warmly to a stage show featuring a nationally known, racially integrated young peo-

ples' singing and dancing group called "Up With People"; and stated, "The fact that we had the assembly at all was a major achievement." (c) When on October 8, 1975 black students complained about what they called the prison environment at the school, his written response on October 14 was, "When the student body demonstrates by its actions that it can and will assume the responsibility for its actions, there will be no need of the 'prison atmosphere.'" (d) At the hearing, previous to the court's visits to the school, Dr. Reid testified, "There is learning and teaching going on in every room. Any person who walks through the building can see that for himself." (e) When asked on cross examination whether, in view of the fact that there were no black players on the football team, he favored black student participation in school sports, he replied in substance, "It's a good idea for all students to engage in sports." During his testimony, which has not yet been transcribed, thus requiring the court to rely on its notes and recollection, Dr. Reid tended to prescind from the racial dimensions of subjects he was discussing, almost as if reluctant or embarrassed to speak directly about racial hostilities and problems.

A receivership of South Boston High School has been selected as the vehicle for effectuating the required changes and the capable superintendent of the district in which South Boston High School is located, Mr. Joseph McDonough, has been named receiver because these interventions would least interfere with the normal operations of the school. On the basis of the history of these proceedings, the court can expect no assistance from the school committee as presently constituted. Approximately a year ago, a majority of the present committee filed answers to interrogatories of the court in which they stated that they "will take no initiative or affirmative action to advocate or supplement a plan which in conscience and principle" they oppose. They have lived up to their pledge. This attitude has guided their present counsel in what counsel refer to

as their "advocacy" approach to these proceedings. For example, at a hearing on July 31, 1975, discussion turned to a recent vote of the school committee; the court noted that it did not have a copy of the vote and requested school committee counsel to supply the court with a copy, whereupon counsel asked "May I have that in a specific order, your Honor?" (pp. 11–23; see also pp. 104 ff.)

The principal but by no means only tactic of the school committee in obstructing and avoiding implementation of the desegregation plan, *Morgan v. Kerrigan*, D.Mass.1975, 401 F.Supp. 216, aff'd, 530 F.2d 401, No. 751194 (1 Cir., filed Jan. 14, 1976), and other remedial orders entered in this case has been to do no more than what the court has ordered explicitly. The court is therefore compelled to rely on the good faith and professionalism of various officials and employees of the school system to carry out the spirit as well as the letter of its orders, in this instance the order to improve both desegregation and education at South Boston High School.