Tallulah MORGAN, et al.,
Plaintiffs-Appellees,

v.

John O'BRYANT, et al., Defendants,

Boston Teachers Union, Local 66, AFT,
AFL–CIO, Intervenor-Appellant.

No. 81–1730.

United States Court of Appeals,
First Circuit.

Argued June 3, 1982.
Decided Aug. 27, 1982.

James T. Grady, with whom Gabriel O. Dumont, Jr., and Grady, Dumont & Dwyer, Boston, Mass., were on brief, for intervenor-appellant.

Robert H. Blumenthal, Counsel, Massachusetts Dept. of Educ., with whom Robert H. Bohn, Jr., Sp. Asst. Atty. Gen., and Bohn & Kaplan, Boston, Mass., were on brief, for plaintiffs-appellees, Com'r and Bd. of Educ.

Robert Pressman, with whom Larry J. Johnson, Cambridge, Mass., was on brief, for plaintiffs-appellees.

Before CAMPBELL and BOWNES, Circuit Judges, and PETTINE,* District Judge.

BOWNES, Circuit Judge.

This case is part of the ongoing Boston public school desegregation litigation. The Boston Teachers Union, Local 66, AFT, AFL–CIO (BTU) appeals from the district court's order of August 21, 1981, (the August order) denying its motion to modify a June 25, 1981 order of the district court (the June order), the end result being that teachers at South Boston High School (SBHS) are shielded from layoffs ordered by the Boston School Committee (the School Committee). Appellees are the plaintiffs, black schoolchildren and their parents, and the Commissioner and Board of Education for the Commonwealth of Massachusetts. Under the order that BTU seeks to modify, no teacher can be removed from or transferred into SBHS without the approval of the SBHS headmaster, Jerome Winegar, and the Community Superintendent for District 6. This procedure is said to conflict with provisions in BTU's collective bargain-

---

* Of the District of Rhode Island, sitting by designation.

ing agreement that base layoffs strictly on seniority (subject to lawful federal court orders) and that allow more senior teachers whose positions in some schools are eliminated to "bump" less senior teachers in other schools. This conflict requires resolution because the School Committee, caught in a budget crisis, has ordered the layoffs of several hundred teachers.

Some background to the instant litigation is helpful. Following its finding that defendants, the School Committee, and the Superintendent of the Boston public schools, had intentionally maintained the Boston public schools as an illegal segregated dual school system, *Morgan v. Hennigan*, 379 F.Supp. 410 (D.Mass.), aff'd sub nom. *Morgan v. Kerrigan*, 509 F.2d 580 (1st Cir. 1974), *cert. denied*, 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975), the district court attempted to construct an appropriate remedy.[1] Busing was an integral part of the remedy. South Boston High School became the vortex of the storm of protest against the use of busing to integrate the schools. There is no need to recite the sad litany of acts of violence that took place in and around SBHS. The district court was forced to concentrate a great deal of its time and effort on the volatile situation at SBHS. It, therefore, became very knowledgeable about all aspects of the educational program at the school as well as the extent and source of its segregative practices. During one phase of the litigation, plaintiffs moved to close South Boston High School. The court denied the motion but instead, finding considerable evidence of continuing discrimination against students,

placed the high school in receivership. *Morgan v. Kerrigan*, 409 F.Supp. 1141 (D.Mass. 1975); see *Morgan v. McDonough*, 540 F.2d 527 (1st Cir. 1976), *cert. denied*, 429 U.S. 1042, 97 S.Ct. 743, 50 L.Ed.2d 755 (1977) (affirming orders relating to receivership); *Morgan v. McDonough*, 548 F.2d 28 (1st Cir. 1977) (affirming other similar orders). The district court attributed part of the continuing problem of segregative activity and racial discrimination at SBHS to the actions and attitudes of the white faculty there. *Morgan v. Kerrigan*, 409 F.Supp. at 1147–49; see *Morgan v. McDonough*, 540 F.2d at 531. The court ordered the receiver at SBHS to arrange for the transfer of SBHS's headmaster, full-time academic administrators, and football coach, and the court authorized the receiver to evaluate all SBHS faculty and to make such transfers and replacements as he saw fit to achieve desegregation. See *id.* at 529 & 534; see also *Morgan v. McDonough*, 548 F.2d 28.

The SBHS receivership lasted approximately three years, until August 31, 1978. The district court then entered an order (the 1978 order) terminating the receivership and modifying a consent decree proposed by the defendants. *Morgan v. McDonough*, 456 F.Supp. 1113 (D.Mass.1978). The district court rejected BTU's objections to several provisions that purportedly interfered with BTU's collective bargaining agreement on behalf of the teachers; the court did provide that staff transfers into SBHS would be subject to the collective bargaining agreement after August 31, 1980.[2] *Id.* at 1116. This two-year limita-

---

1. See *Morgan v. Kerrigan*, 388 F.Supp. 581 (D.Mass.1975), aff'd, 530 F.2d 431 (1st Cir.), *cert. denied*, 426 U.S. 935, 96 S.Ct. 2649, 49 L.Ed.2d 386 (1976) (order regarding faculty recruiting and hiring); *Morgan v. Kerrigan*, 401 F.Supp. 216 (D.Mass.1975), aff'd, 530 F.2d 401 (1st Cir.), *cert. denied*, 426 U.S. 935, 96 S.Ct. 2649, 49 L.Ed.2d 386 (1976) (basic remedial order); *Morgan v. Kerrigan*, 509 F.2d 599 (1st Cir. 1975) (affirming provisional remedy regarding faculty transfers and hiring); *Morgan v. Kerrigan*, 509 F.2d 618 (1st Cir. 1975) (refusing to stay civil contempt sanction against three members of Boston School Committee for

failure to comply with order to produce desegregation plan).

2. Paragraph 15 of the Complete Order Terminating South Boston High School Receivership provided as follows:

Notwithstanding inconsistent collective bargaining provisions, the School Committee will direct the Superintendent of Schools and the Associate Superintendent for Personnel for a period until August 31, 1980 to transfer automatically into and appoint to South Boston High School any staff member of the Boston Public Schools who so requests and is designated by the Headmaster of South Boston High School to fill any vacancy or new

tion is reflected in other parts of the 1978 order, although it does not affect the entire order. The paragraph prescribing percentages of black staff, for example, is not time-limited.[3]

In the spring of 1981, the School Committee, acknowledging a crisis in the school budget, announced the anticipated layoff of several hundred teachers. Under the collective bargaining agreement, senior teachers whose positions at other Boston public schools are eliminated pursuant to the layoffs would be able to "bump" or replace junior teachers at SBHS whose positions they are qualified to take. The School Committee, however, moved for a court order to make layoffs at SBHS subject to the following rules: [4]

> Any reduction in teaching and administrative personnel at South Boston High School shall be carried out as follows:
>
> 1. No member of the teaching or administrative staff may be removed without the consent of the Headmaster and the Community Superintendent for District 6.
>
> 2. No person may be assigned to any teaching or administrative position at South Boston High School without the consent of the Headmaster and the Community Superintendent for District 6.
>
> 3. Except as herein and in applicable court orders provided, reductions in teaching and administrative staff shall be carried out in accordance with relevant collective bargaining procedures.

Under these rules, teachers at SBHS could be protected by the headmaster and the community superintendent from "bumping." On June 25, 1981, the district court granted the motion on "[t]he principal basis ... that the motion comes from the school defendants." The district court also emphasized that the experience of the SBHS faculty was important because "[t]he struggles and controversies at South Boston High School are not over." The School Committee then changed its position and on July 31, 1981, moved to delete the first numbered paragraph of the motion. Under the proposed modification, the headmaster and community superintendent would have been able to approve or reject transfers into SBHS but not to prevent seniority removals. On August 21, 1981, the district court denied this second motion of the School Committee, reasoning that "[t]he successful *permanent* desegregation of SBHS is dependent upon the maintenance of the integrity of that staff." (emphasis in original). The district court observed that its 1978 order had not contemplated the "drastic" layoffs ordered. It referred to recurrent

---

position. After the time period indicated, staff transfers into South Boston High School will be subject to the usual limitations relating to the collective bargaining process.
Because most employment decisions are made during the summer before the school year, this two-year provision expiring on August 31, 1980, had the effect of controlling employment decisions for three school years, 1978–79, 1979–80, and 1980–81.

3. Paragraph 19 of the Complete Order Terminating South Boston High School Receivership provided as follows:

Appointment for professional and non-professional positions at South Boston High School by the School Committee shall be made on the basis of one black person to one white person until not less than 20% of the professional staff and 20% non-professional staff are black. In addition, affirmative action efforts shall be continued until no less than 25% of each of these staffs are black. The appointment of other minority persons shall not count as the appointment of a white

or a black person. However, the School Committee shall use their best efforts to continue to increase the percentage of other minority personnel at South Boston High School.

4. Before this, in March, 1981, BTU had moved to enforce the two-year time limit contained in paragraph 15 of the 1978 order, *see* note 2 *supra*, and thus to make personnel decisions at South Boston High School subject to the collective bargaining agreement. This motion did not, however, seek to address the question of layoffs. Rather, as counsel told the district court, it focused on "excessing" in the Boston public school system, the procedure whereby teachers are transferred between schools as positions are eliminated and others opened up. "Excessing" is different from layoffs in that it does not involve the involuntary dismissal of teachers for economic reasons. "Excessing," instead, reflects educational decisions about how best to allocate teachers among schools.

efforts of some residents of South Boston to disrupt the educational programs at SBHS and to revive the turmoil there. Conceding that teachers elsewhere in the Boston school system were as dedicated to desegregation as those at SBHS, the district court determined that the experience of the current SBHS faculty in conducting the special programs used to desegregate SBHS was crucial and justified the faculty's insulation from the seniority layoff system. BTU appeals from this August order only; it does not challenge the power of the headmaster and the community superintendent to approve transfers into SBHS, as provided in the June order.[5] This is not the first Boston school case to deal with the problem of layoffs; we recently discussed the effect of the ordered layoffs on minority hiring goals in *Morgan v. O'Bryant*, 671 F.2d 23 (1st Cir. 1982), *pet. for cert. filed*, 50 U.S.L.W. 3998.-20 (June 17, 1982).[6]

We review the district court's August order only for abuse of discretion. *Morgan v. O'Bryant*, 671 F.2d at 25. In constructing a desegregation remedy, the district court enjoys broad and flexible equity powers, but these "powers may be exercised only on the basis of a constitutional violation." *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971). Accordingly, one requirement for a school desegregation remedy is that the remedy be "related to 'the *condition* alleged to offend the Constitution. . . .'" *Milliken v. Bradley*, 433 U.S. 267, 280, 97 S.Ct. 2749, 2757, 53 L.Ed.2d 745 (1977) (*Milliken II*), quoting

*Milliken v. Bradley*, 418 U.S. 717, 738, 94 S.Ct. 3112, 3124, 41 L.Ed.2d 1069 (1974) (*Milliken I*) (emphasis in original). In addition, a remedy must fulfill two other requirements: it must be remedial in nature, restoring victims to the position that they would have occupied in the absence of discrimination, and the remedy must take into account the interests of state and local authorities. *Milliken II*, 433 U.S. at 280–81, 97 S.Ct. at 2757; *Morgan v. O'Bryant*, 671 F.2d at 26–29. BTU contends that the August order satisfies none of these standards.

BTU argues that the August order bears no relationship to violations at SBHS, thereby failing the first *Milliken II* test, because there are no longer any constitutional violations at SBHS attributable to defendants. According to BTU, the 1978 order terminating the SBHS receivership was based on findings that segregation had been eliminated at SBHS. The only ground for the August order, BTU contends, was the district court's concern about hostility from persons outside the school, which is insufficient under *Milliken II*. We believe that this argument misapprehends the nature of the district court's findings. To begin with, the district court never suggested that the effects of prior segregation had been eliminated at SBHS when it terminated the receivership. The 1978 order contained detailed provisions about the continued operation of SBHS, including regulation of faculty transfers into SBHS. Where necessary, provisions of BTU's collective bargaining agreement were held not

---

5. It should be pointed out that this appeal involves some, but not all, teaching positions at South Boston High School, although the exact numbers are in doubt. Counsel for the School Committee stated below—and counsel for BTU has repeated him here—that 26 of 48 teaching positions at SBHS are vulnerable if "bumping" is allowed its full effect. Counsel for the School Committee also stated that he would advise the School Committee that, even if "bumping" may be practiced, the racial proportion of teachers at SBHS must be maintained. Of the 26 teachers at SBHS who would be vulnerable, 15 are white, 10 are black, and one is another minority. They could be replaced only by members of their own race. The district court made no findings as to the total

number of potentially vulnerable teachers at SBHS, nor did it make any rulings as to any racial proportions. It appears that, depending on the school budget, the figure of 26 may well change. With respect to racial proportions, the issue is not before us, and we suggest no views thereon.

6. Since the argument in this case, the Supreme Court has decided two school desegregation cases, *Washington v. Seattle School Dist. No. 1*, —— U.S. ——, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982), and *Crawford v. Board of Educ.*, —— U.S. ——, 102 S.Ct. 3211, 73 L.Ed.2d 948 (1982). Neither decision, however, appears to have any bearing on this case.

to apply to SBHS. *Morgan v. McDonough*, 456 F.Supp. at 1116.

Of course, by 1981 the district court might have found that the effects of segregation had been eliminated at SBHS, but it did not. In June, it declared that "[t]he struggles and controversies at South Boston High School are not over." In August, it found that exposure of SBHS to the massive layoffs ordered by the School Committee—never contemplated in 1978—would endanger the special programs established at SBHS to further its desegregation. The primary reason for this conclusion was the need to retain teachers who were familiar with the problems of SBHS and who, as expressed in the uncontradicted testimony of SBHS headmaster Jerome Winegar,[7] "have whatever that little thing is that sets them apart from other people [and] makes them able to deal with kids whose behavior is such that they can disrupt the school, and make them work together." Winegar explained that transferring experienced teachers from other schools to replace the present SBHS faculty would not be sufficient to continue the amelioration of the school's racial strife. The teachers now at SBHS were approved by Winegar under the receivership; special efforts were made to ensure that people who "were ready to commit[ ] their lives to integrating the school racially ... [and] were willing to work night and day to do that" were chosen. Winegar forecast that with an all-new faculty and limited security personnel, the school would be open "only about three days" in the fall. With a new faculty and dismantled special programs, the only way to keep SBHS open would be to return to the earlier large police presence and metal detectors, and to expel many children from school. In Winegar's opinion, such an approach "doesn't make sense."

In light of this testimony, we cannot say that the district court abused its discretion in concluding that layoffs of a great portion of the SBHS faculty would undermine desegregation efforts. The court could reasonably conclude that keeping the present teachers on the faculty at SBHS was a necessary part of the process of eliminating the effects of past desegregation and protecting the progress already made toward that goal. *Cf. Morgan v. O'Bryant*, 671 F.2d at 28 (orders "were necessary to safeguard the progress toward desegregation painstakingly achieved over the last seven years").

In connection with its argument on the first *Milliken II* requirement, BTU claims that the district court's August order failed to balance individual and collective interests as required by *Swann v. Charlotte-Meckelenburg Bd. of Educ.*, 402 U.S. at 16, 91 S.Ct. at 1276; *see Morgan v. McDonough*, 548 F.2d at 31. While it is doubtful what, if anything, this requirement adds to the *Milliken II* standards (preceding, as it does, the opinion in *Milliken II*), we believe that the district court balanced various interests as best it could. It is important to point out that the district court is not ordering or countermanding layoffs throughout the school system; the June and August orders affect which teachers are vulnerable to layoffs but not their total number. BTU and the Boston public teachers (and, perhaps, the School Committee) have an interest in seeing that seniority controls layoffs, but the district court could reasonably have deemed this an interest less important than preservation of efforts to desegregate SBHS. Assuming that twenty-six teachers at SBHS are potentially vulnerable to lay-

---

**7.** BTU objects to consideration of this evidence, which was first brought to our attention at oral argument. First, according to BTU, it was not designated part of the record pursuant to Fed. R.App.P. 10(b)(3). The duty of designation falls on an appellee only after he is notified by the appellant that the appellant is designating only part of the record. We do not know whether this was done in this case. In the circumstances, we believe it appropriate to consider the testimony. *Cf.* Fed.R.App.P. 30(a). BTU's second objection is that Winegar's testimony was unsworn. This is true, but it is also true that this was apparently long-standing practice in the remedial phase of this litigation, that BTU's counsel, although present, did not object, and that BTU was allowed to examine Winegar. Presumably BTU could have sought to present its own witnesses, but it did not.

offs or "bumping," *see* note 5 *supra*, only twenty-six of the several hundred laid off teachers elsewhere will benefit. For most of the Boston public school teachers, any order relative to layoffs at SBHS will not affect their real interest, which is in being laid off or not. Their interest in seniority-based layoffs at SBHS is abstract and speculative. By contrast, students at SBHS enjoy a constitutional right to a desegregated public school education. This interest is more important, particularly in a school such as SBHS with a history of segregative actions and racial discrimination, than the interest of a few school teachers in seniority-based layoffs.

■ The second *Milliken II* requirement, that the relief ordered be of a genuine remedial nature, reflects concern that the district court not go beyond the needs of the plaintiffs. In school desegregation cases, this concern has meant that a court not order a systemwide remedy if only a few schools are segregated, *see Dayton Bd. of Educ. v. Brinkman*, 433 U.S. 406, 417–20, 97 S.Ct. 2766, 2774–75, 53 L.Ed.2d 851 (1977), and that a court not impose desegregation requirements that outlast the segregation found and that instead respond to relatively benign demographic changes, *see Pasadena City Bd. of Educ. v. Spangler*, 427 U.S. 424, 431–37, 96 S.Ct. 2697, 2702–05, 49 L.Ed.2d 599 (1976). Nevertheless, it remains incumbent upon the district court and defendants to eliminate segregation "root and branch," *Keyes v. School Dist. No. 1*, 413 U.S. 189, 213, 93 S.Ct. 2686, 2699, 37 L.Ed.2d 548 (1973), quoting *Green v. County School Bd.*, 391 U.S. 430, 438, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968). More than merely the named plaintiffs are aggrieved by segregation in the schools. *United States v. Texas Educ. Agency*, 564 F.2d 162, 175 & n.23 (5th Cir. 1977), *rehearing denied*, 579 F.2d 910 (5th Cir. 1978), *cert. denied*, 443 U.S. 915, 99 S.Ct. 3106, 61 L.Ed.2d 879 (1979), citing *Keyes v. School Dist. No. 1*, 413 U.S. at 203, 93 S.Ct. at 2695; *Hart v. Community School Bd.*, 512 F.2d 37, 53–55 (2d Cir. 1975). The composition of school faculties is one factor to be considered in vindicating the rights of public

school children to education in a unitary school system. *Morgan v. O'Bryant*, 671 F.2d at 27; *Morgan v. Kerrigan*, 530 F.2d at 432; *see Morgan v. Kerrigan*, 509 F.2d at 600 n.3.

■ BTU contends that the August order is not sufficiently remedial to satisfy *Milliken II* because the district court based its attempt to preserve the SBHS faculty not on the need to remedy actions of the defendant School Committee but to fend off "recurrent efforts by a small number of residents of South Boston, who have no connection with the school as parents or students or employees, to disrupt its educational programs and revive the turmoil which has harmed its students and staff repeatedly during the past seven years." We reject BTU's argument on two grounds. First, we are unable to conclude that hostility in some parts of South Boston to desegregation at SBHS was the sole reason for the August order. The court also referred to "the experience of the present staff in conducting successfully the special programs that have been established at South Boston High School," and there was testimony from headmaster Winegar to the effect that many of the programs that had helped restore the quality of education at SBHS would disintegrate without SBHS's experienced teachers. Second, BTU's argument neglects the special history of segregation and desegregation at SBHS in which the faculty and the community have played an important role. Before SBHS was placed in receivership, the district court found evidence that the faculty had been, at least, responsive to actions in the community opposing desegregation, *see Morgan v. Kerrigan*, 409 F.Supp. at 1145–46, and that outsiders—persons officially unaffiliated with SBHS—had vigorously—and at least partially successfully—resisted desegregation at SBHS, *see id.* at 1146–47. The 1978 order terminating the SBHS receivership also acknowledged the continued importance of community feeling by providing for a Community Outreach Program and an Instructional Aide Program, which used nonteachers from South Boston, and by re-

quiring SBHS to notify certain outside groups of planned changes in SBHS programs. Activity in the community and by the faculty thus have long been and continue to be factors in the desegregation of SBHS, and we conclude that the August order, which focused on the community, was properly remedial.

■ The third prong of the *Milliken II* test requires the district court to "take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution." *Milliken II*, 433 U.S. at 280–81, 97 S.Ct. at 2757. At the outset, it is a little difficult to discern the interests of the School Committee (the local authority) and the Commonwealth. The School Committee originally made the motion that became the June order; it then apparently changed its mind and sought the modification at issue here. The School Committee has not, however, appealed from the August order although it has advised us that it stands by its last motion. Meanwhile, the Commonwealth Board of Education supported the School Committee's July 31 motion below, but it now asks that we affirm the August order.[8] Assuming these positions to be the last ones, we find them to be in conflict. Granting greater weight to the local authority, the School Committee, which sought to modify the June order, we nevertheless believe that it was within the district court's discretion to reject the proposed modification. The court could reasonably have concluded from headmaster Winegar's testimony and from its own intimate knowledge of SBHS that a large turnover in staff at SBHS would threaten to erode the school's desegregation programs that had been so painstakingly established. There is no contrary evidence. The School Committee's preferred order would still, it is true, allow Winegar and the community superintendent to screen incoming teachers and thereby to help maintain the

quality of SBHS's programs, but the district court considered it at least equally important to retain the experience of the current SBHS faculty by permitting the headmaster and the community superintendent to screen removals. We cannot find this an abuse of discretion.

■ In addition to its *Milliken II* argument, BTU contends that the August order violates the principle of *Pasadena City Bd. of Educ. v. Spangler*, 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976), that once a district court has implemented desegregation relief, its remedial powers are at an end. In *Spangler*, the district court, as part of its effort to achieve a unitary school system in Pasadena, California, had decreed a plan for school attendance designed to create racial neutrality in school assignments. The plan included a provision that there would be no majority of any minority in any school. Four years later, the court refused to modify the no-majority-of-any-minority requirement. It held that the requirement was an inflexible one and that it had been violated by a number of schools. The only apparent reason for the "violations," however, was that demographic changes had occurred in the makeup of the Pasadena population. The court of appeals affirmed, but the Supreme Court reversed, holding that absent any showing that school population changes were the result of segregative actions by the defendants or the result of some other constitutional violation, the district court's power to decree a remedy had ended when it implemented its earlier plan. *See id.* at 431–37, 96 S.Ct. at 2702–05.

In this case, BTU argues that the 1978 order achieved the desegregation of SBHS and that there is no evidence of continued segregative acts by the defendants; therefore, *Spangler* renders the August order an invalid exercise of remedial power. We cannot agree. The district court issued the

---

8. Given these inconsistencies, it is appropriate here to remark on the apparent failure of any party to object to the July 31 motion below. The record is clear, though, that the district court heard arguments on the motion before the time for responding to the motion had ex-

pired, and we think it is clear that the plaintiffs, at least, reserved making a decision on the appropriate response at the time of the hearing. We do not think that any objection was waived or that the district court erred in denying an "unopposed" motion.

June and August orders in response to planned layoffs by the School Committee, layoffs that would interfere substantially with the desegregation programs at SBHS, according to Winegar's uncontroverted testimony. Unlike the disapproved order in *Spangler,* the June order, as unmodified by the August order, is conditional: it has no effect until the School Committee orders layoffs. The district court retains the power to protect SBHS when actions by the School Committee threaten desegregation there, as the district court found that they did. *Cf. Wright v. Council of City of Emporia,* 407 U.S. 451, 463–66, 92 S.Ct. 2196, 2203–05, 33 L.Ed.2d 51 (1972) (upholding district court's order preventing city's otherwise lawful move to establish its own school system because new second system would interfere with attempt to desegregate schools). In addition, in contrast to *Spangler,* there has been no evidence contrary to Winegar's testimony that the current SBHS faculty is necessary to conduct the SBHS programs, nor any evidence that the programs have served their function and may be discontinued.

We are mindful, as BTU has emphasized, of the human cost of the teacher layoffs and of the serious decline in morale that the layoffs have engendered. Although we cannot see how a decision either way on the August order will improve or erode morale, it is true that the issue of teacher layoffs generally encompasses some problems that are far removed from the desegregation of the Boston public schools. This fact counsels us—and the district court—to tread warily in further proceedings. We would expect the district court to hold hearings early next spring (and annually thereafter, if need be) to determine whether the insulation of the SBHS faculty from layoffs is still necessary. At such a hearing there should be clear testimony as to any factors requiring such continued insulation and the district court should make express findings supporting whatever orders are issued. The timing of this hearing should make it possible for any revised order to govern personnel decisions for the school year beginning the following autumn. *Cf. Morgan*

*v. McDonough,* 548 F.2d at 33 (urging district court to initiate proceedings to review need for receivership at SBHS).

*The order of the district court is affirmed.*