ARMANDO PEREZ & others [1] vs. BOSTON HOUSING AUTHORITY.

Suffolk. October 9, 1979. — February 4, 1980.

Present: HENNESSEY, C.J., BRAUCHER, KAPLAN, WILKINS, & LIACOS, JJ.

*Boston Housing Authority. Housing. Practice, Civil,* Master, Receiver. *Judgment. Jurisdiction,* Housing. *Constitutional Law,* Separation of powers, Judiciary. *Judge. Public Officer.*

In an action by tenants in various developments of the Boston Housing Authority seeking to vindicate their statutory rights to decent, safe and sanitary housing, it was within the judge's authority under G. L. c. 111, § 127H (*a*), to place the authority in temporary receivership where the Authority had failed, over a long period and after fair opportunity, to remedy widespread violations of the State Sanitary Code and to secure performance of interim injunctive orders and of a consent decree voluntarily adopted by the parties. [736-738]

A judgment placing the Boston Housing Authority in temporary receivership did not have the effect of removing the Authority's board members from office in violation of G. L. c. 121B, § 6. [738-739]

A judgment placing the Boston Housing Authority in temporary receivership did not violate against the constitutional principle of separation of powers. [739-740]

In an action by tenants in various developments of the Boston Housing Authority seeking to vindicate their statutory rights to decent, safe, and sanitary housing, there was no merit in the Authority's contention that the judge should have disqualified himself on the ground of his alleged bias. [740-741]

In an action by tenants in various developments of the Boston Housing Authority seeking to vindicate their statutory rights to decent, safe, and sanitary housing, the fact that the judge on occasion had ex parte conversations with Authority employees, although improper, did not warrant reversal of the judgment. [741-742]

---

[1] The tenants joining originally with Perez as class representatives were: Maria Laboy, Alejandrina Montes, Mary Wellings, Margaret Gerkin, Grace O'Leary, Ruby Perkins, Linda Ferdinand, and Dolores Culbreath. Two additional tenants joined later: Pauline Morgan and Rita Driscoll. Boston Public Housing Tenants' Policy Council, Inc., was admitted as an intervening party plaintiff.

CIVIL ACTION commenced in the Housing Court of the City of Boston on February 7, 1975.

The case was heard by *Garrity, J.*, in that court and in the Superior Court.

The Supreme Judicial Court granted a request for direct appellate review.

*Mark A. Michelson (Paul M. Stein* with him) for the defendant.

*Bruce E. Mohl* for the plaintiffs.

*Gerard J. Clark,* for the Boston Public Housing Tenants' Policy Council, Inc., intervener.

KAPLAN, J. Nine persons, tenants in various developments of the Boston Housing Authority (BHA), brought this action for themselves and on behalf of the whole class of tenants of BHA similarly situated, seeking to vindicate their statutory rights to decent, safe, and sanitary housing. (See G. L. c. 121B, § 32; also c. 111, § 127H). The judge below found at successive stages of the action that many of the units and common facilities of BHA housing were in substandard conditions in violation of the State Sanitary Code (see G. L. c. 111, § 127A). In order to right the wrong and provide a remedy, the judge attempted a number of expedients, based essentially on exercise of his injunctive powers, to guide and compel performance by BHA. These failed. After much effort, a comprehensive consent decree was formulated. This also failed. The judge found upon lengthy trial that a major cause of the failures was lack of willing and competent leadership on the part of the five-member Board of BHA. Finally, as an ultimate recourse, after nearly five years of litigation, the judge took the step of ordering appointment of a "receiver" (to be appointed "as soon as possible")[2] who would assume temporarily the functions of the Board (see G. L. c. 121B, § 5), subject to court order, this again with a view to securing, to the extent that

---

[2] We place quotation marks around the words "receiver" and "master," when they first appear in this opinion, to signify that they are not the exact equivalents of the officers of court who usually go by those names.

competent management contending with financial stringency could do so, the minimal statutory rights upon which the action was grounded. We have to decide whether this remedial step — certainly an exceptional one — exceeded the bounds of legality or discretion. We hold that it did not, and affirm the judgment appealed from, with a modification to be mentioned.

## I. The Basic Record

We give a summary account of this protracted case embodied in a very extensive record. In doing so we apply the rule that findings of fact made by the judge below are to be accepted by us unless clearly erroneous, Mass. R. Civ. P. 52 (a), 365 Mass. 816 (1974), and we also take the view that more general appraisals by the judge, who presided in the case from the beginning, are entitled to respect although they are not binding on us. Cf. *Commonwealth* v. *Jones*, 375 Mass. 349, 354 (1978).[3]

A. *Initiation of the Action in Boston Housing Court.* The plaintiffs, duly certified in the proceedings as class representatives, commenced this action against BHA in the Housing Court of the City of Boston on February 7, 1975, basing their claims primarily on G. L. c. 111, § 127H, the general statute entitling residential tenants to relief against landlords for violations of the sanitary code.[4] Soon the plaintiffs joined in the action certain so-called "State defendants," including notably the Secretary of Communities and Development who, through the Department of Community Affairs

---

[3] The proceedings leading direct to the judgment appealed from are described at point I E 1 below, but for proper understanding our narrative starts at the commencement of the action. The judge's findings are similarly retrospective.

We outline the course of the action and describe the basic situation to which the judgment is addressed, as it emerges from the record. Various claims of inadequate evidence do not affect the basic picture and we need not discuss them.

[4] Section 127H is reproduced as an Appendix to this opinion.

(DCA), had supervisory responsibilities toward local housing authorities including BHA. (Also joined were the Commissioner of DCA and the Treasurer and Governor of the Commonwealth).

The judge of the Housing Court found in his decision of March 28, 1975: "As indicated by the evidence in this case and by scores of criminal and civil complaints by its tenants against B.H.A. on the dockets of this Court which complaints were corroborated by the evidence in those cases concerning which I take judicial notice . . ., a number, unascertainable at this time but probably the great majority, of the residential units of buildings owned and operated by B.H.A. as well as the buildings themselves are not decent, nor are they safe . . . nor are they in compliance with the State Sanitary Code." The judge also found that BHA did not have sufficient funds to bring those properties up to standard.

The liability of BHA under § 127H as landlord was clear as a matter of law, and only the propriety and feasibility of particular remedies could remain in any doubt. Section 127H did not itself apply to the State defendants, but a claim had been asserted against them under a related § 127N which permitted joinder of, and held jointly liable with the landlord, any other person who had authority to decide whether to rehabilitate the property in question. The judge believed that the Secretary of Communities and Development could be held liable for the code violations through § 127N, and on that theory ordered the State defendants to take certain measures calculated to result in the provision of additional State funds to BHA for purposes of rehabilitation of developments in need.

B. *First Appeal to this Court.* 1. *Dismissal of "State defendants."* The State defendants — not BHA — appealed to this court. We agreed with the judge's findings about conditions in the BHA properties — we said the situation was "appalling" (368 Mass. at 341, n.5) — but we held, for the reasons to be read in our opinion, *Perez* v. *Boston Hous. Auth.,* 368 Mass. 333, 336-341, decided on July 10, 1975

(appeal dismissed sub nom. *Perez* v. *Bateman*, 423 U.S. 1009 [1975]), that § 127N was inapplicable to the Secretary of Communities and Development; thus any directions in the judgment aimed at compelling the State to furnish funds to BHA were inapposite. The State defendants were dismissed from the action.

2. *Remand to Boston Housing Court for remedial action.* However, we acknowledged the "disturbing social implications" of our holding. *Id.* at 334. "The Commonwealth cannot be required to expend funds for rehabilitation of BHA property; yet hundreds, and probably thousands, of tenants are living in substandard units which the judge has characterized as 'not decent.' Without adequate funding, the alternatives appear equally unacceptable: either the tenants continue to live in conditions which are unlawful under the sanitary code, or the substandard units are to be withdrawn from use, with the accompanying probability of many persons left homeless." *Id.* at 341-342. We described graphically the scope of the problem.[5]

Nevertheless we thought there was still room for significant remedial action by the court. "Jurisdiction of the subject matter (violations of the sanitary code) resides in the Housing Court, of course, and that court's powers embrace such matters, relating to both the problem and the cure of

---

[5] "These conditions directly affect a substantial percentage of the residents of Boston. The BHA owns and operates nineteen federally aided developments for families of low income with a total of 10,348 dwelling units (seventy-three per cent of such units in the Commonwealth), ten State aided developments for families of low income with a total of 3,681 units (twenty-seven per cent of such units in the Commonwealth), twenty-five federally aided developments for elderly persons of low income with a total of 2,613 units (ninety-four per cent of such units in the Commonwealth), and two State aided developments for elderly persons of low income with a total of 160 units (sixty per cent of such units in the Commonwealth). The BHA also leases from private landlords 2,655 dwelling units pursuant to various Federal programs (ninety-seven per cent of such units in the Commonwealth), and fifty-nine units pursuant to various State programs (three per cent of such units in the Commonwealth). Residents living in BHA owned and leased housing projects comprise in excess of ten per cent of the total population of Boston." *Perez* v. *Boston Hous. Auth.*, 368 Mass. 333, 342 (1975).

the sanitary code violations, as vandalism, crime, alleged mismanagement, and the marshalling of tenant cooperation. Furthermore, the Housing Court judge has demonstrated, in his considerable efforts up to this point, both sympathetic understanding and competence directed toward the special problems of the BHA." *Id.* at 343. "[F]urther proceedings," we said, "despite the lack of availability of State funds as decided in this case, may result in appropriate orders against BHA related to the sanitary code. See G. L. c. 111, § 127H. Moreover, additional proceedings may well offer guidance and precedent for future cases involving not only mandatory action by BHA, but also discretionary action by the legislative and executive branches." *Id.* at 343-344. We concluded: "The case is remanded to the Housing Court for further proceedings as to the BHA in the discretion of the judge and consistent with this opinion." *Id.* at 344.

C. *Search for Remedy in Boston Housing Court.* To return, then, to the Boston Housing Court. The judge, in finding BHA liable under § 127H, had directed, by way of initiating a remedy — "[a]s a first step in responding to especially intolerable conditions set out in the findings of fact" — that BHA prepare plans, recommendations, and proposed court orders in certain "areas of immediate concern." These "areas" included the identification of vacant apartments and apartments which placed the health, welfare, or safety of tenants in "serious jeopardy," and preparation of plans for cleaning and securing unoccupied apartments, and removing broken glass from the several developments. BHA was also to prepare temporary or provisional plans on the issues of vandalism, crime, racial segregation, and extension of leased housing operations. It was "to consult with and request assistance from the Class and tenants groups which represent the Class as well as with other appropriate governmental and non-governmental agencies and organizations." Looking to longer-range rehabilitation was an order requiring BHA to hold a "mobilizing conference" to determine how best to use the resources of man-

power and money in the Boston area to modernize BHA's decaying physical properties.

1. *Appointment of "master."* Such a conference was held in April, 1975 (while the appeal of the State defendants was pending). The "consensus" of those attending was that BHA would need expert assistance to accomplish any improvements. The consensus opinion appeared to be confirmed as BHA began to file plans with the court, as it had been ordered to do. A question arose what form the expert assistance should take. BHA in fact itself filed with the court a draft order regarding appointment of a "master"; the plaintiffs presented a draft order for appointment of a receiver. The events of April were referred to in the preambles to the important "Order of Reference" issued by the judge on May 22, 1975. He rejected at that time the more intrusive course of appointing a receiver, as suggested by the plaintiffs. Instead, he appointed Robert B. Whittlesey to serve as master.[6] The master was to gather information through investigation and through consultation with the personnel of BHA and any others, official or private, who could be of help. He might prepare draft orders responding to "especially intolerable individual situations." He was also charged with preparing certain plans, some of them related to tasks that had been cast on BHA by the court's first "interim" order (referred to at 2 below). But his chief duty, to be performed over a period of more than a year, was to prepare interim and long-range plans for the maintenance and rehabilitation of the properties. As many ills, of which vandalism was typical, were at once the causes and effects of the physical breakdown of the developments (pointing both to "the problem and the cure," as we later said [368 Mass. at 343]), the master's plans must necessarily encompass those matters. BHA was charged with a duty of assist-

---

[6] The master's prior experience as a civil engineer and city planner appears of record. He is not a lawyer. Just before this appointment he served as executive director of Greater Boston Community Development, Inc., which gave technical assistance to sponsors of low and moderate income housing.

ing the master, including the furnishing of all data that he might require.

2. *"Interim" injunctive orders.* In the period to September, 1976, there is record of numerous attempts by the judge, often with the help of the master, to meet or anticipate crises or lesser difficulties arising in the management of the BHA developments, all related in one way or other to the correction of substandard conditions. A problem might be brought to the judge's attention by the plaintiffs or the master. It might be raised by the judge himself through his knowledge of BHA operations deriving from the *Perez* action or from separate criminal or civil proceedings initiated by individual tenants in the Boston Housing Court over which he presided as Chief Justice. The so-called "interim" orders or rulings made in this period as part of the *Perez* action sometimes went to the BHA operations as a whole, sometimes affected particular developments. Thus we find that an "Interim Identification/Rectification/Relocation Plan" and an "Interim Identification/Clear-Up/Securing Plan," developed by BHA and the master, were ordered into effect with stated deadlines. When deadlines were not met, the judge particularized his order to speed up action at given developments. Other "interim" orders were directed initially to particular developments to secure if possible quick correction of severe problems: repairs of roofs at the Mission Hill and West Broadway developments are examples. Still other orders prevented BHA from taking action that would undercut rehabilitation: for example, the Board's attempts to purchase additional housing from the Federal Department of Housing and Urban Development (HUD) and to lay off thirty-eight maintenance employees.

Thus progressively using his injunctive powers, and observing the occasions for his orders and the manner of their carrying out, the judge gained increasingly the impression that there was a grievous lack of coordination in the higher echelons of the BHA staff, resulting in serious inefficiency, and indicating an absence of effective leadership at the top. Symptomatic were failures to place roofing at Mission Hill,

to deal with budget submissions, to supply a list of inadequate apartments at Columbia Point and Mission Hill (resulting in a contempt adjudication), and to make progress in administering a modernization program at Columbia Point. In some of his memoranda explaining his orders and examining the responses to the orders the judge became severely and vehemently critical of BHA performance. In the instance last cited, modernization at Columbia Point, the judge wrote (June 22, 1976) that this failure was just one in a line of failures, an example of the "demonstrated inability of BHA's top level management to manage and operate BHA adequately and to carry out the orders of this Court in this case."

3. *Master's report of July 1, 1976.* The master filed his culminating draft report, standing in five volumes, on July 1, 1976, giving his impressions of the situation as he had observed it. His chronicle was not a happy one. Financial conditions: BHA on the "edge of bankruptcy" due in part to "the protracted delay by BHA in taking adequate administrative steps to bring expenses into line with income and subsidies." Management of developments: Criticized for BHA's policies preventing the managers from participating in decisions affecting their respective development sites. Maintenance operations: The ordinary maintenance program "an impenetrable morass." Modernization: "[G]rossly inefficient and slow"; capital improvements "suffered from major, unjustifiable delays." Development planning: Acquisition of new developments stressed unduly as against rehabilitation of the existing developments, resulting in confusion of criteria as to which developments needed most support. Security: A serious problem, traceable in part to a failure to monitor activities of the security department. Tenant selection: BHA's plan faulty in various respects, including its response to the problem of segregated housing; but the criticism mooted somewhat because the staff did not follow the plan, responding instead on an ad hoc basis to individual tenant applications. Tenant involvement: Participation in administration and allocation of maintenance

and modernization funds hampered by inadequate information and poor administration and management of these programs by HUD, DCA, and BHA.

Addressing itself to the internal administration of BHA, the master's report found a tradition of employing persons on the basis of "political sponsorship and nepotism" which had affected the quality of the work. Further, "there are major problems in the capability of the BHA to communicate, implement and administer major policy decisions and programs within the Authority." BHA officials had failed to see the extent and seriousness of the deficiencies in the traffic of information within the organization, in the direction and delegation of authority, and in the capacity of some BHA personnel to get the job done.

Turning to the Board of BHA, the report "discovered little evidence that the Board is fully aware of the scope and seriousness of these problems or has provided the leadership necessary to resolve these major problems." The Board had failed to make policies — it had set none on such important matters as budget determinations and the effort to eliminate operating deficits; maintenance; priorities in spending modernization funds and allocation of money to a "target project program"; tenant selection. The administrator was criticized for not attempting to explain the major problems to the Board, but it was pointed out that over the years the members of the Board had not felt sufficiently impelled to ask the questions. Longstanding problems had thus been left not only without solution but without direction guides toward solution.

In an attempt to fill this void in decision making the master set out detailed recommendations for substantive and procedural changes.

4. *Plaintiffs' application of August 4, 1976, for receiver.* The master's report was followed on August 4, 1976, by a motion on the part of the plaintiffs for the appointment of a receiver with authority temporarily to run BHA in an attempt to bring the properties up to sanitary code levels. The point made repeatedly in this submission was that, in the

face of its notorious shortage of funds and dependence on never-adequate subsidies (in this sense BHA was called "insolvent"), any waste of money in the operation of the properties due to mismanagement must have dire effect; and the motion charged that there had been wanton waste as a result of mismanagement for much of the time since May 22, 1975, without over-all improvement, and indeed with deterioration of the housing and increased lapsing of units and buildings into the category of the uninhabitable. Detailing their claims of mismanagement, the plaintiffs referred among other things to BHA's unsatisfactory performance under the orders of court, and finally attributed responsibility to "the highest levels of the corporation, including the Administrator [chief officer appointed by the Board] and Board . . . ." The course of events since May, 1975, showed that the court, even with the assistance of a master, could not by sporadic use of the injunctive power prevent mismanagement; and interposition of a receiver must be tried as a remedy of last resort. For legal authority for such appointment, the plaintiffs' motion cited G. L. c. 111, § 127H, aided by § 127I, as well as the court's general or inherent equity powers.

On its part BHA objected to and moved to strike the master's report and to revoke the order of reference designating him.

Discovery in respect to the plaintiffs' application was under way in August and September, 1976, with hearings set for September 3, 1976.

D. *Formulation of Consent Decree.* At this stage the main parties, joined by Boston Public Housing Tenants' Policy Council, Inc. (TPC) (an intervener plaintiff broadly representative of the residents of BHA housing), commenced negotiations looking to conciliation and agreement on a plan of action to implement the statutory duty and liability originally declared. By invitation of the parties, the judge joined actively in these discussions which were ramified and long protracted. The judge devoted "hundreds" of hours to this work. When, on October 6, 1976, he retired

from the Boston Housing Court to accept appointment as a judge of the Superior Court, the *Perez* case by order of our court, on consent of the parties, was transferred to the Superior Court and assigned there to remain in the same judicial hands. Negotiations continued under the same auspices and eventuated in a "consent decree," approved after due notice, to become effective on June 1, 1977.

1. *Nature of the decree.* We do not undertake a detailed description of this decree running in the record to 291 pages.[7] The judge said: "The Consent Decree can best be viewed as an effort to achieve implementation of the reccommendations set out in the Master's July 1, 1976, Report by means short of receivership." At the heart of the decree was an "Agreement" listing plans under thirteen heads: Central Administration Reorganization, Personnel Department, Financial Plan, Purchasing Department, Central and Project Stores, Maintenance, Department of Data Systems and Processing, Management of BHA Developments, Modernization and Planning, Security, Tenant Selection and Marketing Plan, Evictions, and Legal Department. The topics went varying distances toward completeness, that is, with respect to some matters, BHA was given fairly specific plans with directions what to do (for example, BHA was directed to eliminate a given position or to fill a position in a stated time); as to other matters, the plans or parts of them were in less detailed form and looked to the preparation by BHA of "Sub-Plans" which it undertook within stated tolerances of time to prepare and put into effect: "Each Sub-Plan must provide, insofar as is reasonably possible, a highly effective means of carrying out the particular purposes and provisions of the Plan which it is intended to supplement." The judge considered that "[t]he Plans were designed to be implemented within available financial resources so that necessary changes would not be delayed while the BHA searched for additional funds."

---

[7] In describing the decree, we do not follow its terminology in all respects.

2. *Monitoring provisions.* The master was reappointed under the decree. He was given particularly strong powers in respect to the hiring of persons at the higher levels of BHA administration and promotion into those positions.[8] He was to make himself available to assist BHA in carrying out its agreed duties under the decree and was to monitor and report upon the actual performance. In case of any instance of "substantial noncompliance" with the decree (as defined),[9] The master, or a party, could give notice and, failing a mutually agreed adjustment, could invoke a disputes procedure that would bring the issue to the court for hearing and decision.

The decree had a stated life of three years, but under § 10A of the decree it "shall be vacated at any time upon the application of any Party, if such Party demonstrates that, because of a change of law or any other reason, its further functioning will in all likelihood be so substantially unworkable that it will not substantially achieve the significant particular purposes of the Plans. The Court, in making such a determination, will issue written findings of fact and rulings which will support such determination."[10]

E. *Allegations of Failure of Performance Under Consent Decree. 1. Notices of substantial noncompliance; plaintiffs' applications.* We skip here to November, 1978. In that eighteenth month of the consent decree, the master forwarded to BHA some twenty-six notices of substantial non-

---

[8] See § IX.1 of the decree (Agreement part). A job description was to be agreed between BHA and the master; he was to receive notice of the qualifications of applicants and of the interviews held, and be given a list of the names of candidates BHA considered qualified. The Board must appoint one of those on the list whom the master was satisfied to designate as "most highly qualified."

[9] The definition looked to any action taken by any party that was seriously inconsistent with any significant term of the decree including the Agreement, plan, subplan, and so forth.

[10] Receivership was mentioned as ground for vacation of the decree, with BHA not conceding jurisdiction to appoint a receiver. § 10B. Persistent failure to perform in good faith or wilful and persistent interference was also a stated ground. § 10C.

compliance.[11]  These were met by counter assertions.  The notices were the basis of a plaintiffs' application of December 28, 1978, under the disputes procedure.  On the same day the plaintiffs applied in the action pursuant to § 10A, above quoted, for vacation of the decree, and as further relief, for the appointment of a receiver, citing for the latter remedy (as they had in their application preceding the appointment of the master) G. L. c. 111, §§ 127H and 127I, and the court's equity powers; to which was added § 10D of the decree which allowed the court to make appropriate orders if the decree was vacated, without foreclosing BHA from contending that any such orders were wrong or beyond the court's jurisdiction.

2. *Alleged basis for vacation of decree.*  On the score of vacation of the decree, the plaintiffs charged in effect a pervasive failure of BHA to meet the substantial demands of the consent decree and thereby to make any measure of progress toward improving the condition of the many substandard properties.  In this connection the plaintiffs pointed to certain major failures of compliance with the decree related to notices of substantial noncompliance, including: financial forecasts and programs; consolidated budgets; central stores, maintenance reorganization; work order procedure; repair or securing of vacant apartments; rerental of such apartments; security.  Hereunder the plaintiffs also cited faults of the Board in regard to appointments of higher level officials of BHA, and undue and obstructive interferences by Board members with BHA's day-to-day operations.

---

[11] The parties had theretofore entered into twenty-nine formal modifications of the decree, most of them extending time for various submissions.  The last such formal modification was approved July 24, 1978; further requests by BHA for extensions of due dates were met by the reluctance of the master and TPC to allow such protractions of time if the period of the decree was to remain as agreed.

BHA has complained about the bunching of the notices of substantial noncompliance in November, 1978, but it seems rather a sign of patient tolerance that the notices were not given earlier, and a breakdown of the decree appeared in the offing in any event.

3. *Prayer for receiver.* All reasonable alternatives for remedying the deprivations of decent, safe, and sanitary housing having been now exhausted, the plaintiffs prayed the remedy of a temporary receivership of BHA.

4. *Hearings.* After BHA had filed responses to the plaintiffs' dual applications, the court on consent of the parties consolidated the applications for hearing. After much discovery, the consolidated case was heard on thirty-five days from March 26, 1979, to May 23, 1979. On the part of the plaintiffs and TPC there was testimony from witnesses and documentary evidence. BHA cross-examined extensively and on its own case offered one witness. A massive record was generated. The judge filed findings, rulings, opinion, and judgment on July 25, 1979. From this judgment the present appeal is taken.

F. *Findings as to Nonperformance.* The findings are in some measure retrospective to the beginning of the action, thus dealing with matters mentioned above; but our present interest is in the findings regarding compliance of BHA with the terms of the consent decree which was stated in the decree to be the responsibility of BHA's Board and administrator.

1. *Appointments.* The decree began its active life with some optimism among the parties and signs of the decree's inherent workability, as in the use of the prescribed hiring procedures (and the implementation of a subplan regarding the organization of BHA) to make a considerable number of appointments to staff.[12] However in this very respect there were crucial failures. Samuel Thompson, who was serving as administrator during the negotiation of the consent decree, resigned the office on September 16, 1977, effective October 17. Then followed a series of almost farcical episodes in finding a successor. The Board claimed that the appointment of an administrator was not governed by the

---

[12] On this as on other matters, there is some value in comparing the second and third six-month reports of the master dated July 5, 1978, and January 9, 1979, with BHA's corresponding reports dated July 10, 1978, and January 15, 1979.

decree. The judge held otherwise. The Board's vacillation and neglect or refusal to follow the procedures of the decree, which, as we have seen, assigned an important role in this and in other staff appointments to the master, created a situation where the judge ordered on March 6, 1978, that the Board act finally in a week's time. The appointment went to Bradley Biggs.

There were further difficulties in the attempt to fill the position of deputy administrator. When Biggs resigned on October 13, 1978, an impasse developed in finding a successor which resulted in the master's filing a statement of dispute on March 29, 1979, after hearings on vacation of the consent decree had begun. The judge in his findings pointed to the regrettable fact that BHA was without a permanent administrator for nearly half the period of the decree. This, he found, was chargeable to the Board's acting "recklessly and in bad faith in its efforts to fill the top position at the BHA." [13]

2. *Certain key projects.* The findings go on to deal with the extent and quality of BHA's performance of certain key undertakings set out in the Agreement or stemming therefrom and with the Board's accountability for the performance such as it was.

(a) Under the heading "financial planning," BHA was required by Plan III(A)(1) and (2) to take budgets required by and prepared for the State and Federal Management Programs, and prepare certain studies therefrom. (The State was here represented by DCA, and the Federal interest by HUD, these being the sources of subventions, respectively, for BHA's State- and federally-funded developments.) The studies were to consist of detailed three-year forecasts using alternative assumptions, and, as a "policy document," a detailed three-year program to be revised and

---

[13] It appears that the Board nominated a person immediately after receiving his name from a high ranking official in the Boston city administration. They had not checked his references. Previously they failed to respond to the master's requests to try to agree on a job description.

updated annually reflecting decisions taken on the basis of the forecasts. To an organization under severe constraints of funding, such planning appeared essential. In the judge's view, the (delayed) State forecast as delivered by BHA was inadequate, as was the (longer delayed) Federal forecast, preventing the adoption of adequate financial programs. The "alternative assumptions" requirement was met only superficially.

(b) In a subplan under Plan III(B)(2) for "preparation of consolidated budgets," we have an instance of a scheme of some promise, which was approved, but which failed of implementation. Managers of the various developments were to be brought more fully into the budgeting process in order to reach a better understanding of the costs of maintenance of each development and of means of controlling those costs. The consolidation of those budgets could be expected to produce financially sound operating budgets to be presented to the State and Federal Management Programs. All this called for training of managers and staff. The subplan, adopted in mid-May, 1978, was supposed to be well on the way to implementation by July but by November implementation had hardly begun; indeed BHA had attempted unilaterally to change the subplan and postpone its implementation. Contributing to the failure was an eight-month vacancy in the budget officer's position. The judge thought it highly unlikely that the subplan could achieve its goals during the term of the decree. He took the experience with this subplan as characteristic of an attitude among those responsible for carrying out the decree that it was "only a paper exercise."

(c) One of the notorious failures of BHA had been in the delivery of maintenance supplies to tenants, and an elementary cause was lack of a proper inventory system for maintenance items. Individual workmen were found to have hoarded supplies because they could not rely on existing procedures for requisitioning them. Under Plan V(A) a subplan was early approved for requisitioning, storage, and distribution of items, with appropriate record keeping. The

subplan succeeded to the extent that there was current "inputting" of requisitions into a computer, but major difficulties were not adequately attacked. There were discrepancies between supplies in fact stored and those claimed to be there. The increase of staff stipulated in the subplan was not carried out. The back order problem remained unsolved, that is, no effective system has been developed for providing tolerably reliable information as to what items not in stock would become available to meet given needs.

(d) Under Plan VI(A)(1), the inefficiency of BHA's maintenance of properties was to be tackled by a subplan which would assign laborers, craftsmen, and others to particular developments where their work would be supervised by the development managers who would be charged with responsibility. After objection by the master to a submission of a subplan not properly directed to the delegation to local managers, there was such a lack of cooperation in preparing a resubmission as could, according to the judge, be taken as negatively "probative of the continued workability of the Decree."

(e) Work order procedure which would lead rapidly from tenants' requests for maintenance to assignments of workers, and provide also for priorities in maintenance jobs, was the subject of a required subplan under Plan IV(B)(1). Again submission and resubmission were found by the master to be insufficient among other reasons because they were uncoordinated with other plans. A promised prompt delivery of a final corrected plan did not materialize. The judge again despaired of material accomplishment during the period of the decree.

(f) Under Plan VI(D)(1), BHA was to formulate a pilot study which would appraise whether it was advisable, on grounds of efficiency and cost, to use outside contractors instead of BHA maintenance employees to repair vacant apartments. The project petered out, starting with a first submission that would choose to compare private contractors with "CDBG" crews (under Community Development Block Grant) rather than with BHA crews. The judge

noted again the negative attitude of BHA toward the consent decree as indicative of its unworkability.

(g) BHA was required by Plan VI(D)(4) to prepare and commence to implement a feasibility study examining whether outside companies should be used for routine maintenance tasks. This also wandered on without signficant result, and drew further comments by the judge about the attitude and competence of the organization.

(h) It was agreed on all sides that the problem of dealing with vacancies was serious and difficult. Hence a subplan (under Plan VI[F][1]) was needed to set up a pattern for prompt rerenting of vacant units requiring no or few repairs, and securing others in worse shape, with a complementary work program concentrating on repair and securing of vacancies in chosen developments from year to year. The judge considered the documents submitted to be not up to the mark of the subplan in several respects, and in fact contradictory of some subplans already adopted. He noted that this was an instance of Board members not participating in a BHA proposal which necessarily assumed policy decisions of a high order of importance.

(i) Also of crucial importance was "security" in the sense of the safety of residents from physical and psychological invasion. Several approaches were contemplated.

By Plan X(A)(2), BHA undertook to prepare a subplan to staff and fund the security department, but its submission was merely in the form of a proposal for a blue ribbon committee drawn from the community which would be given the task of formulating the security program. After this beginning, nothing definitive seems to have followed.

A work program was required by Plan X(A)(3) but revision of the original submission evidently was not completed, nor were any programs actually launched.

Preparation of a subplan required by Plan X(B)(4) for the allocation of security guards to developments also languished.

A feasibility assessment of alternative methods of providing security (Plan X[B][5a]) was not supplied, nor was an

assessment of management and legal problems to reduce vandalism (Plan X[D][1]).

It was said that long delay in finding a person to become assistant supervisor of security contributed to these failures. The judge concluded that Plan X was largely unfulfilled and he called "inexcusable" the neglect of the Board and the administrator and acting administrator to see to adequate staffing for security.

(j) Delinquencies were found in performance under an approved subplan (Plan II[B][1]) for "affirmative action" in recruiting, hiring, and promoting employees of BHA, and in appointing a person to head this work.

(k) The Plan XI(C)(1) and (2) directions to hire a "marketing specialist" and to present a subplan for stimulating demand for rentable units were also defaulted.[14]

3. *Flow of information to master.* Sundry provisions of the decree were designed to ensure that BHA would provide adequate current information to the master to enable him to attend to his duties. Yet in various reports the master complained repeatedly that no clear channels had been set up and often he obtained important information only by chance. The judge found that the procedures adopted by BHA in practice "appeared to be designed to inhibit the flow of information to the Master rather than promote it."

4. *Board's performance.*[15] Two members of the Board were called by the plaintiffs at the hearings and interrogat-

---

[14] BHA's record of performance was not one of unrelieved failure, and some of the plaintiffs' charges were not pursued at trial. An attempt to examine all details at trial would have been fulsome. What was called for was an assessment of the seriousness of the situation taken as a whole.

[15] "Every housing and redevelopment authority shall be managed, controlled and governed by five members," three constituting a quorum. G. L. c. 121B, § 5. Four of the five members of the board of a city housing authority are appointed by the mayor subject to city council approval (one such appointee represents organized labor). The fifth member is appointed by DCA as the State representative.

During a substantial period of the consent decree, BHA's board consisted of three members appointed by the mayor. A fourth member, appointed by DCA, began sitting only in January, 1979. The fifth seat was vacant for more than two-thirds of the consent decree period.

ed about their relation to and responsibility for performance under the consent decree. It does these members no injustice to say that they had no clear idea of the requirements of the decree or the state of compliance with its provisions, and that they had not made any serious attempt to supervise such compliance.

One of these witnesses testified that he was so busy with other matters that he was not able to discuss any of the subplans with other Board members, or to see that information requested by the master was provided. He did not know whether subplans had been submitted on time, who wrote them, what they said, or whether the master had accepted them. He relied entirely on BHA staff to tell him about compliance with the decree. He evidently knew very little about BHA's financial structure; did not know what a fiscal year was or when BHA's fiscal year began; did not understand what parentheses around numbers on a balance sheet signified (and thus did not know BHA's current or projected deficit); and did not apprehend the changes of policies regarding maintenance, renovation, and tenant transfers proposed in certain BHA documents submitted to the master and the parties.

The Board's chairperson at first could not recall any discussion of policy matters at Board meetings, but on reflection, when cross-examined, remembered three such occasions, none in relation to the decree. She, too, was unaware of policy positions taken in subplans submitted to the master; and knew nothing about the dates for submission of subplans or failures to submit on time. Except in the most rudimentary manner she could not explain what BHA's budget was like. She had not seen the financial forecasts that had been prepared and indeed remembered no Board discussions of BHA's financial programs.

Testimony by both members showed they had not read the second six-month report of the master about operations under the decree. However they had read the covering letter and admitted under questioning that it raised serious questions about BHA's satisfying the decree (in fact the

report foresaw in many ways the collapse of the decree in the third period); but they were not moved to look into the matter.[16]

According to the testimony, Board members busied themselves answering individual tenants' complaints and the Board approved contracts or dealt with minutiae but did not oversee operations or determine policy.

Indeed a tendency on the part of the Board or its members to reach down to deal with details could have the effect of interfering with lines of authority. The Board on September 1, 1978, voted (among other things) to order the administrator to instruct all officers and employees that they "may communicate fully with, and respond to requests of, members of the Board when requested by a member of the Board without necessity for authorization or approval to do so by their superiors or supervisors." Administrator Biggs thought he saw reason to read this vote as a destructive attempt to interfere with day-to-day activities of BHA, and as damaging to his role. The plaintiffs applied for and obtained an order temporarily restraining implementation of the vote, and testimony was later received in respect to a preliminary injunction, but without conclusion. On October 13, 1978, Biggs resigned.

5. *Conclusion as to the Board.* The judge concluded as follows with respect to the Board: "Under the terms of the Consent Decree, the Board and the BHA's Administrator are responsible for insuring the BHA's compliance with the requirements of the Consent Decree. The evidence introduced at the hearings on the Application to Vacate revealed that the Board is incapable of effective leadership and is unable and unwilling to carry out those responsibilities. The Board's incompetence and indifference to those obligations

---

[16] The foregoing refers to the testimony of the two members from the witness stand. Their depositions were received subject to objections which, however, were not acted on. The deposition of a third member was similarly received. These would not alter the general picture. A fourth member, a DCA appointee, was not questioned; he had been serving for only a short time. See note 15, *supra.*

has directly and substantially contributed not only to the BHA's failure to implement important provisions of the Consent Decree but also to the unprecedented deterioration of the BHA's developments and the widespread violations of the Sanitary Code. Throughout the four-year history of this case, the Board has shown itself to be capable of nothing more than gross mismanagement. The unabated mis- and nonfeasance of the Board necessitates the extraordinary action of appointing a Receiver in this case."[17]

6. *Condition of the housing.* Finally we recur to the condition of BHA housing about the time of the hearings. The state of the physical accommodations as well as their ambiance of course varied from property to property but as to many units, including common areas, the adjective "appalling" still undoubtedly applied. We need not enter into detail about the rampant, continuing violations of the sanitary code. It will be enough to take note of the findings regarding vacancies as indicative of the decline of much of the BHA venture by the year 1979. As to "family" developments (sixteen "Federal" and ten "State"), we have figures indicating that the situation was worse in January, 1979, than it had been around the time of the decision of March 28, 1975; and, further, that the over-all rate of vacancies in those developments had been rising: 15% of "available units"[18] in January, 1977, 20% in January, 1978, and 28% in January, 1979. The rates at particular developments were shocking.[19]

---

[17] In his letter of January 9, 1979, transmitting his report for the third six-month period, the master had, more gently, questioned "whether the current governing structure of the Authority can provide the leadership necessary to bring the Authority back into compliance with its legal responsibilities."

[18] As distinguished from "as built."

[19] Although resisting receivership, BHA conceded in its six-month report filed on January 15, 1979, that little progress had been made in improving the housing, and that some developments may have deteriorated, but it appeared to attribute this record or part of it to the time and energy devoted to the task of rebuilding the organization.

7. *Receivership as last resort.* On the record digested above, the judge concluded, with reluctance, that the leadership vested in the Board of BHA, but only nominally exercised by it, must pass to a qualified person to act as receiver under the aegis of the court. Other approaches had been tried over a considerable period of time, and had not succeeded. It would not make sense to try to continue with the consent decree. In the judge's view receivership was the only remaining expedient which offered a prospect (not a certainty) of moving BHA toward the goal of satisfying the requirements of the sanitary code — the aim of the *Perez* litigation from the outset.

G. *Judgment Appealed From.* Following is an outline of the judgment appealed from which provides for the receivership.[20] The court makes a recertification of class in terms of all residential tenants of properties of BHA in which there are or may in the future be conditions in violation of the State Sanitary Code. The court vacates the consent decree under its § 10A (quoted above), and, having referred to the general equity power, states its intention to appoint a receiver pursuant to G. L. c. 111, § 127H, who, with powers permitted by § 127I, shall have authority to administer, manage, and operate BHA; he shall have the powers of the Board of BHA (including control of funds and revenues) and any additional powers that may be necessary or appropriate; upon his appointment, the Board's powers shall be superseded. To assist the court in selecting a receiver, the master, who is redesignated, shall among his other duties take steps to bring forward the names of qualified persons. An advisory committee of nine or eleven members will be appointed coincidentally with the appointment of the receiver to counsel the court and the receiver in the attempt to achieve the goal of compliance with sanitary code standards.

A series of "interim orders" are made to last until the receiver takes office. These are intended to prevent further

---

[20] The outline omits much and does not attempt correspondence with the terminology of the judgment.

regression of BHA operations during that period. In particular the court expresses its concern lest gains made toward a "patronage-free personnel system" be lost through irresponsible action.[21] "These Orders are drawn largely from the Agreement section of the Consent Decree covering such areas as personnel, contracts and the availability of information to the Master." BHA shall implement all approved subplans (including approved work programs and a certain plan as to tenant selection, assignment, and transfer). There is detailed direction requiring BHA to provide the master with information and for the master's furnishing information so received to the parties or DCA or HUD.

The hiring of personnel at certain salary scales, or their promotion thereto, and the termination or suspension of employees at such scales, are made subject to stated procedures in which the master has a prominent or controlling part, with certain possibilities of review by the court at the instance of a party. BHA shall not enter into or extend contracts for $250,000 or more, or, in the case of service contracts, for $25,000 or more (there are exceptions as to the latter category) without notice to the master and the parties, and the master is empowered to disapprove these agreements, again with a possibility of court review. BHA is required to notify the master of its intention to take steps of serious consequence (as described), and the master may approve or disapprove; in either case a party may seek court review.

The Board of BHA and the administrator and deputy and assistant administrators are charged with primary responsibility for complying with the interim orders.

## II. DISCUSSION OF THE APPLICABLE LAW

A. *BHA's Liability Established.* Although in certain respects a public body,[22] BHA in carrying on its housing func-

---

[21] This refers to a then recent episode in which the Board attempted to extend the contracts of senior level personnel for several years, ostensibly to preserve morale.

[22] See the discussion of the status of BHA at point II B 3 (d), citing the *Johnson-Foster* and other cases.

tions is submissible to and must abide by the ordinary substantive law of the Commonwealth — the rules of contract, tort, and so forth. See G. L. c. 121B, § 13; *Costonis* v. *Medford Hous. Auth.*, 343 Mass. 108, 113 (1961); *Ryan* v. *Boston Hous. Auth.*, 322 Mass. 299, 300 (1948); *Johnson-Foster Co.* v. *D'Amore Constr. Co.*, 314 Mass. 416, 419 (1943). In its relations with its tenants, BHA has rights and duties like those of other landlords: this appears from many decided cases. See, e.g., *Boston Hous. Auth.* v. *Hemingway*, 363 Mass. 184 (1973). And, like other landlords, BHA is under duties as prescribed by G. L. c. 111, §§ 127A-127N, including the duty to maintain residential properties in accordance with the minimal standards established by the State Sanitary Code. See *Hemingway, supra* at 191-193. Early in the present litigation — when the judge entered the judgment in the Boston Housing Court from which the "State defendants" took the first *Perez* appeal — there was a judicial determination that BHA was seriously in breach of the basic obligation of G. L. c. 111, § 127H, and that situation continues to this day.

B. *Equitable Remedies.* BHA's liability being established, the problem posed by this important litigation has been to find remedies appropriate and efficient to restore the properties as far as possible to the levels prescribed for human habitation. It must be confessed with remorse, not unmixed with shame, that this problem has proved intractable to this date. An attempt at a remedy by compelling better funding through the State defendants failed on appeal by reason of a necessary interpretation of the statutes. At that time we remanded the cause to the lower court with the recommendation that it proceed in its discretion to explore possibilities under the legislation, G. L. c. 111, §§ 127A-127N, which has been called a "comprehensive" effort or plan to compel compliance with the health and safety standards. See *Negron* v. *Gordon*, 373 Mass. 199, 201-202 (1977).

The judge below, following this court's suggestion, quite naturally and properly resorted to G. L. c. 111, § 127H (*a*),

as the remedial instrument: "The court may: (*a*) issue appropriate restraining orders, preliminary injunctions and injunctions." This is read correctly as an invocation of the traditional equity powers, broad and flexible as they are understood to be. From this source flowed the order of reference appointing a master and the issuance of the "interim" orders mentioned at points I C 1-2 above. Discouraging results as reported by the master led to a clamant demand by the class plaintiffs for a receivership. This the judge resisted, and reliance again was placed on the injunctive remedy, short of receivership, in the form of a negotiated consent decree.

1. *Amenability of public officials to affirmative injunctions.* BHA was amenable to such injunctive relief whether or not by its consent. It is true that injunctions going against public officials (elected or appointed) for violations of law, and especially injunctions that require the officials to take affirmative remedial steps, have been resisted from time to time on the mixed grounds that they would have the effect of cancelling the discretion or latitude of action supposed to inhere in the offices held[23] and would present awkward or difficult problems of enforcement. But it is now clear that such injunctions are not inhibited for those reasons alone. Illustrative is the well known case of *Commonwealth* v. *Hudson,* 315 Mass. 335 (1943) (municipal chlorination of water; violation of statutory obligation); and, more recently, *Blaney* v. *Commissioner of Correction,* 374 Mass. 337 (1978) (treatment of prisoners in "protective custody" status; violations of statutory standard), and *Commonwealth* v. *Andover,* 378 Mass. 370 (1979) (municipal revaluation of properties for tax purposes; violations of both statutory and constitutional standards). See *Amherst-Pelham Regional School Comm.* v. *Department of Educ.,* 376 Mass. 480, 494-495 (1978); *Board of Health of N. Adams* v.

---

[23] This is sometimes expressed as an argument in terms of "separation of powers," as it was in the *Blaney* case mentioned in the text below. See 374 Mass. at 342-343. See also point II B 4 (b) below.

*Mayor of N. Adams,* 368 Mass. 554, 564-568 (1975). On the larger scene, we may point to the extensive experience of the past quarter century with so called "institutional remedial litigation" (sometimes called "extended impact" litigation), starting with the desegregation of public schools. At the center of this entire movement has been the injunctive remedial process directed to officials who have failed to abide by legal standards, commanding them to take affirmative action, often over a wide and sensitive range. See the remarks in *Swann* v. *Charlotte-Mecklenburg Bd. of Educ.,* 402 U.S. 1, 15 (1971).[24]

Of course an injunction is never lightly granted and, like other judicial remedies, should be no more intrusive than it ought reasonably be to ensure the accomplishment of the legally justified result. This rule of the reasonably-confined remedy has obvious and peculiar relevance where public officials are the objects of injunction.[25]

2. *Amenability to equitable remedy of receivership.* Thus BHA could not fairly deny the legitimacy of the use of § 127H (*a*) affirmative injunctions against it in the attempt to achieve the ultimate goal of conformance with the sanitary code. A narrower and more plausible contention is that the equitable remedy of a receivership goes too far and exceeds the power or jurisdiction of the court. Questions of power to appoint a receiver were adverted to and reserved in *West Broadway Task Force, Inc.* v. *Commissioner of the Dep't of Community Affairs,* 363 Mass. 745, 754 n.21 (1973).

---

[24] "If school authorities fail in their affirmative obligations under these holdings, judicial authority may be invoked. Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies."

[25] *Stretch* v. *Timilty,* 309 Mass. 267 (1941), is a case where violation by a public official (police commissioner of Boston) was not found; in that situation the court warned against any judicial attempt to control the discretionary activity of executive or administrative officers, and referred to the constitutional requirement of separation of powers.

(a) *Sections 127H (d) and 127I.* The plaintiffs, addressing themselves to this question of power or jurisdiction, suggest that it is promptly answered by § 127H (d): "The court may . . . (d) appoint a receiver." Then they cite § 127I: "Upon appointment such receiver shall post such bond as may be deemed sufficient by the court, shall forthwith collect all rents and profits of the property as the court shall direct and use all or any of such funds, or funds received from the commonwealth as hereinafter provided,[26] to enable such property to meet the standards of fitness for human habitation. A receiver shall have such powers and duties as the court shall determine, including the right to evict for nonpayment of rent. A receiver may be a person, partnership or corporation." The riposte is that § 127I seems to look to a mere rent receiver of a particular property and — as the parties were agreed in the argument before us — no property-by-property receiverships, whether of the simple "rent" variety or of a type endowed with more ample powers, could possibly meet effectively the problems confronting BHA: receivership, if that remedy is to be used at all, must be single and entire. On a superficial view, therefore, §§ 127H (d) and 127I may appear inappropriate as a basis for a general receivership.

Nevertheless, there is strength in the position that while § 127I is naturally geared to the prospect of many homely occasions for rent receiverships of single private properties which become offensive to the sanitary code, the section, especially in the light of its second sentence ("such powers and duties as the court shall determine"), can be read together with § 127H (d) to empower the court on compelling facts to install a receivership of broader coverage, not limited to a single property or to the rents. Suppose a case where a private landlord has a number of properties in what amounts to single ownership, some or all of the properties

---

[26] The reference is to G. L. c. 111, § 127J (receiver may petition court for leave to apply for financial assistance from the Commonwealth, through the Department of Public Health, to supplement the rent funds for the purpose of effectuating repair and rehabilitation).

are in violation, and unitary administration beyond mere collection and use of rents is needed under court supervision. We do not exclude the possibility that §§ 127H (d) and 127I may suffice for the appointment of a single receiver to do a complete job; and on that reading of the statutes the same may hold with respect to BHA as an entity.

(b) *Section 127H (a) and general equity powers.* However, the question under those cited statutes need not be labored, because another and very satisfactory source of power exists for the appointment of a unitary receiver for BHA. That is § 127H (a) itself — the injunctive provision which invokes general equity powers. The power to compel affirmative action by injunction draws with it a power in the court to call to its assistance any agents or officers — we may call them parajudicial officers — whose services appear to be reasonably necessary to attain a legitimate objective. (Indeed the power may be said to inhere in a court whether sitting on the "law" or "equity" side according to the historical division.) See, e.g., Mass. R. Civ. P. 53 (masters), 66 (receivers and similar officers), 70 (person appointed by court to vest title), 365 Mass. 817, 834, 836 (1974). As Mr. Justice Brandeis said in the leading case, *Ex parte Peterson*, 253 U.S. 300, 312 (1920), validating the appointment of an "auditor": "Courts have (at least in the absence of legislation to the contrary) inherent power to provide themselves with appropriate instruments required for the performance of their duties. Compare *Stockbridge Iron Co.* v. *Cone Iron Works*, 102 Massachusetts 80, 87-90 [1869]. This power includes authority to appoint persons unconnected with the court to aid judges in the performance of specific judicial duties, as they may arise in the progress of a cause." The views of this court are in accord. See, e.g., *Fratantonio* v. *Atlantic Ref. Co.*, 297 Mass. 21, 23 (1937); *New England Theatres, Inc.* v. *Olympia Theatres, Inc.*, 287 Mass. 485, 491 (1934); *Holmes* v. *Hunt*, 122 Mass. 505 (1877).

3. *Detail as to receivership.* (a) *Attempted artificial confinement of the remedy.* BHA evidently would put receivers in a separate class, and their appointment beyond the

powers of an equity court, when the effect of the receivership would be virtually to take over the main functions of public officials (who, by hypothesis, have been in violation of the law). We think no such prohibitory rule attaches,[27] although, as we shall emphasize, a receivership must be thoroughly justified on the facts, is always to be considered a remedy of "last resort," and therefore is not often applied in practice.[28]

(b) *From injunctions to "neoreceiverships."* The circle we are urged to draw around the figure of the receiver would be a highly artificial one. As noted, remedial injunctions have gone against officials directing them what to do, and to that extent we can say that the officials have been supplanted as a practical matter. The injunctions, moreover, which have become familiar in institutional reform litigation — prisons, mental health facilities, schools, legislative reapportionment, and so forth — have often been very detailed, tightly controlling the officials initially found delinquent and leaving them with minimal discretion in correcting those delinquencies. As we observed in the *Blaney* case, above cited, as injunctions meet with indifference or violation on the part of the defendant officials, there is justification for the more detailed directions further confining or eliminating discretion. "Consistent with the proper judicial function, a judge, whose orders have been ignored or misunderstood, may state more explicitly the steps to be taken and may order the filing of compliance reports in order to achieve obedience to the judicial mandate. See *Colabufalo* v. *Public Bldgs. Comm'r of Newton*, 336 Mass. 205, 212 (1957); *Wisconsin* v. *Illinois*, 289 U.S. 395, 405-406

---

[27] A claim that receivership, if available at all, should be confined to cases where the illegality partook of unconstitutionality, would be equally artificial. Compare the grounds of the *Blaney, Andover,* and *Hudson* cases cited earlier in the text.

[28] Receivership is also sparingly and carefully applied in the ordinary business setting. See 12 C.A. Wright & A.R. Miller, Federal Practice and Procedure § 2983 (1973).

(1933). As to judges' authority to fashion detailed orders to correct established violations of constitutional rights, see *Swann* v. *Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971), and *United States* v. *Montgomery County Bd. of Educ.*, 395 U.S. 225, 234-236 (1969)." *Blaney, supra* at 342. The rule of thumb may be that the more indurated the violations of law and the remedial injunction, the more imperative and controlling the later superseding injunction. On the matter of detailed prescriptions, see Note, The *Wyatt* Case: Implementation of a Judicial Decree Ordering Institutional Change, 84 Yale L.J. 1338 (1975); Note, Implementation Problems in Institutional Reform Litigation, 91 Harv. L. Rev. 428 (1977).

Still further, it is characteristic of decrees in the fields of institutional reform that they appoint sundry parajudicial officers to assist the court not only in delineating remedies, but often in conducting or overseeing the actual implementation of the remedies. These agents or officers of the court are given functions accommodated to the particular needs. They are called by different names: masters, special masters, examiners, experts, monitors, referees, commissioners, administrators, observers, visitors, ombudsmen, committees, panels, etc. See Special Project: The Remedial Process in Institutional Reform Litigation, 78 Colum. L. Rev. 784, 826-837 (1978); Brakel, Special Masters in Institutional Litigation, 1979 Am. B. Foundation Research J. 543, 546-556. See also *United States* v. *Manning*, 215 F. Supp. 272, 289-294 (W.D. La. 1963) (three-judge court) (Wisdom J.); *Hart* v. *Community School Bd. of Brooklyn*, 383 F. Supp. 699, 762-767 (E.D.N.Y. 1974), aff'd 512 F.2d 37 (2d Cir. 1975). Significantly, the court adjuncts referred to have, as a group, been called "neoreceivers." Comment, Equitable Remedies: An Analysis of Judicial Utilization of Neoreceiverships to Implement Large Scale Institutional Change, [1976] Wis. L. Rev. 1161. The point to be made, again, is that the enjoined officials for practical purposes are replaced as to function — here, quite visibly — in the degree

needed to attain or restore legality.[29]  Cf. *Inmates of Attica Correctional Facility* v. *Rockefeller,* 453 F.2d 12 (2d Cir. 1971).

(c) *Basis of receivership.*  Finally, we have examples, where exigent facts exist, of the appointment of receivers, eo nomine, to take over temporarily the essential functions of the delinquent officials and in substance to replace them. That the power to do this exists has been stated or assumed. See, e.g., *Lewis* v. *Kugler,* 446 F.2d 1343, 1351 n.18 (3d Cir. 1971); *Society for Good Will to Retarded Children, Inc.* v. *Carey,* 466 F. Supp. 722, 727 (E.D.N.Y. 1979).  Cf. *Bracco* v. *Lackner,* 462 F. Supp. 436, 455-456 (N.D. Cal. 1978).  The considerations or principles governing such temporary receiverships are set forth in *Morgan* v. *Mc-Donough,* 540 F.2d 527 (1st Cir. 1976), cert. denied, 429 U.S. 1042 (1977), where, however, the context was different from the present — receivership of a public school in the course of a larger desegregation effort.  See *Newman* v. *Alabama,* 466 F. Supp. 628 (M.D. Ala. 1979) (prison reform); *Turner* v. *Goolsby,* 255 F. Supp. 724 (S.D. Ga. 1966) (three-judge court) (schools).[30]

In *Morgan* the court observed that receivers are familiar instruments of equity, most often used to manage distressed

[29] The mechanisms at work in the creation of a neoreceivership or, in the more extreme case, a receivership of a public institution, are fairly clear.  The political process has failed to produce an institution conforming to law and those subjected to the illegality, who are usually politically powerless (cf. *United States* v. *Carolene Prods. Co.,* 304 U.S. 144, 152 n.4 [1938]), turn to the courts for the vindication of their rights.  Injunctive remedies are called for, but the judge lacks expertness in the particular field, and lacks time even when he chances to have the knowledge.  Hence the appointment of adjunct officers who supply expert knowledge and sometimes implicitly encourage acceptance by the parties and the general public of the results of the judicial intervention.

For a view of the relations set up between the court and a "special master," see the Brakel article, cited in the text, at 553-555, discussing *Taylor* v. *Perini,* Civ. No. 69-275 (N.D. Ohio 1975).

[30] In each of the three cases the receiver appointed held an official position.  The judgment appealed from in the present case would allow for the appointment of an official.  Of course we express no opinion about the desirability or undesirability of such an appointment herein.

businesses but used for other purposes as well. A combination of circumstances justified the particular receivership installed by the District Court: repeated or continuous failure of the officials to comply with a previously issued decree;[31] a reasonable forecast that the mere continued insistence by the court that these officials perform the decree would lead only to "confrontation and delay";[32] a lack of any leadership that could be expected to turn the situation around within a reasonable time. Other less drastic expedients had been exhausted, leaving receivership as the next logical step if the institution involved was not to be closed (as, indeed, the plaintiffs in the class action had proposed). Receivership, accordingly, was approved, however reluctantly. It was understood to be extraordinary and should end as soon as feasible. (In fact the receivership lasted two years and was then terminated.)

(d) *Present case.* BHA is not a school board and the factual context here was much different from that in *Morgan*

---

[31] For the litigative history, see *Morgan v. Hennigan,* 379 F. Supp. 410 (D. Mass. 1974), aff'd sub nom. *Morgan v. Kerrigan,* 509 F.2d 580 (1st Cir. 1974), cert. denied, 421 U.S. 963 (1975); *Morgan v. Kerrigan,* 388 F. Supp. 581 (D. Mass. 1975), aff'd, 530 F.2d 431 (1st Cir.), cert. denied sub nom. *Doherty v. Morgan,* 426 U.S. 935 (1976); *Morgan v. Kerrigan,* 401 F. Supp. 216 (D. Mass), aff'd 523 F.2d 917 (1st Cir. 1975), 530 F.2d 431 (1st Cir. 1976), cert. denied sub nom. *Doherty v. Morgan,* 426 U.S. 935 (1976); *Morgan v. Kerrigan,* 409 F. Supp. 1141 (D. Mass. 1975), aff'd sub nom. *Morgan v. McDonough,* 540 F.2d 527 (1st Cir. 1976), cert. denied, 429 U.S. 1042 (1977). See Smith, "The Boston Case" in Limits of Justice (H. Kalodner & J. Fishman, eds. 1978).

[32] "The more usual remedies — contempt proceedings and further injunctions — were plainly not very promising, as they invited further confrontation and delay; and when the usual remedies are inadequate, a court of equity is justified, particularly in aid of an outstanding injunction, in turning to less common ones, such as a receivership, to get the job done. *Milltown Lumber Co. v. Town of Milltown,* 150 Ga. 55, 102 S.E. 435 (1920); *Columbian Athletic Club v. State,* 143 Ind. 98, 40 N.E. 914 (1895). See Note, *Monitors: A New Equitable Remedy?,* 70 Yale L.J. 103, 107-13 (1960)." *Morgan v. McDonough,* 540 F.2d 527, 533 (1st Cir. 1976), cert. denied, 429 U.S. 1042 (1977).

In Eisenberg & Yeazell, The Ordinary and the Extraordinary in Institutional Litigation, 93 Harv. L. Rev. 465 (1980), the authors stress the historicity of various remedial devices employed in institutional reform litigation.

or the other cited cases. A combination of conditions existed here, however, that looked finally to a receivership remedy. There had been massive trouble with eliciting performance of injunctive orders and finally of a comprehensive decree. There could be little doubt that to persist in that course — retention of the consent decree or reversion to a regime of injunction without consent — could end only in frustration. True leadership of BHA had in fact lapsed. Be it noted that the question was not whether members of the Board were or were not trying hard. The statutory rights of tenants were not to be equated merely with the Board's best efforts. Cf. *Jefferson* v. *Southworth*, 447 F. Supp. 179, 190 n.8 (D.R.I. 1978). The tenants were entitled to a leadership that had the potential for reaching out to achieve the objectives set by the law. Receivership had not been decided upon precipitately;[33] although earlier sought by the plaintiffs, it had been refused until experience with the consent decree under the existing BHA management established to the satisfaction of the judge that a change of command was indispensable. The Board cannot justly complain of being superseded when it failed, over a long period and after fair opportunity, to secure performance to the level of the injunctive orders and then the consent decree, a decree not thrust upon it but voluntarily adopted.

In holding that the judge did not commit error in finally approving a receivership, we observe that that remedy appears much less drastic in the present situation than it would be in the more typical situations of institutional reform. There is no question here of Federal power entering upon relationships created by the State. Indeed receivership here, installed by a State court in a State setting, does not

---

[33] In this connection it may be noted that early actions antedating *Perez* that sought judicial intervention to correct conditions at the BHA developments were treated by the courts with circumspection and restraint in the hope that nonjudicial remedies could be found. *West Broadway Task Force, Inc.* v. *Commissioner of the Dep't of Community Affairs*, 363 Mass. 745 (1973); *Boston Pub. Hous. Tenants' Policy Council, Inc.* v. *Lynn*, 388 F. Supp. 493 (D. Mass. 1974).

invade any "line" department or unit of city or State: although, as indicated, BHA is a public body, it functions in many respects as a business corporation to which receivership is readily adapted. See *Johnson-Foster Co.* v. *D'Amore Constr. Co.*, 314 Mass. 416, 419 (1943); cf. *Commonwealth* v. *Toomey*, 350 Mass. 345 (1966) (turnpike authority). The work of a receiver, although beset by collateral problems of no mean difficulty, will focus, after all, on property conservation and rehabilitation. Moreover the problems, both central and collateral, have been canvassed and put in some order by the consent decree whose due performance was beyond the capacities of the old team but may be within the competence of the new. That, at any rate, is a hope not too distant from expectation.

The proposed receivership was certainly understood by the judge to be temporary, that is, intended to run only as long as needed. This, however, was not made sufficiently clear in the judgment and we shall direct not only that a suitable provision to that effect be incorporated, but, in addition, that the judge below at intervals of one year hold hearings on reasonable notice to consider whether the receivership should be terminated and the receiver's functions restored to the Board, as the Board may then be constituted. (This will not preclude any other applications to end the receivership.) The judgment should provide also that, during the period of the receivership, segregable portions of the functions taken over [34] may be surrendered to the Board where such steps appear appropriate, also after hearings on reasonable notice.

4. *Residual contentions.*[35] (a) *As to removal of officials for cause.* A procedure is provided by statute for the re-

---

[34] At one point in the *Perez* proceedings the "leased housing" (see note 5, *supra*) was dealt with on a special basis. (We mention this to illustrate the text and not to express any opinion about the segregability or nonsegregability of this phase of BHA's operations.)

[35] We think it unnecessary to deal with certain procedural claims made by BHA which are not consequential. BHA finds fault with the recertification of class in the judgment, although it agreed to the certification in

moval of Board members from office on charges as therein defined. See G. L. c. 121B, § 6; *Belinfante* v. *Mayor of Revere,* 352 Mass. 712 (1967); *Bunte* v. *Mayor of Boston,* 361 Mass. 71 (1972). Cf. *Collins* v. *Selectmen of Brookline,* 325 Mass. 562 (1950). It is suggested that a receivership, in that it transfers functions from the Board to the receiver, is tantamount to removal of the members for cause and so is in illegal contradiction to the statute cited. Although the judge was certainly critical of the performance of the Board, he was not purporting to apply the statutory criteria for removal of any individual member, nor was it competent for him to consider the matter of removal which in the first instance is for the mayor and council. We have noted that the fact, if it was a fact, that the Board members were exerting themselves to the limit of their actual abilities would not itself absolve BHA of violations of law calling forth equitable remedies, but presumably such strenuous efforts might have some bearing in the consideration of any attempt to remove members from office under the statute. The judgment in the present case does not remove any member of the Board from office and the operations of BHA or part of them may indeed hereafter be returned to the control of the Board with its then appointed membership.

(b) *As to separation of powers.* BHA argues that the judgment herein would offend against the principle of separation of powers which finds expression in art. 30 of the Declaration of Rights of our Constitution. But if it is a function of the judicial branch to provide remedies for violations of law, including violations committed by the executive branch,[36] then an injunction with that intent does not derogate from the separation principle, nor, by extension, does a receivership otherwise properly instituted. To the

---

the consent decree. If the representation by the particular named plaintiffs has weakened over the years, there may be improvement after remand by the introduction of additional representatives of the class.

[36] In view of its hybrid character, already alluded to, BHA does not quite fit in the "executive" branch; separation-of-powers considerations may thus be attenuated to begin with.

contrary, when the executive persists in indifference to, or neglect or disobedience of court orders, necessitating a receivership, it is the executive that could more properly be charged with contemning the separation principle. A separation-of-powers argument advanced in the *Blaney* case drew this remark: "Indeed, the executive's [correction commissioner's] refusal to obey such judicial orders itself seems to violate art. 30, by abrogating judicial decrees, an exclusively judicial function." 374 Mass. at 343 n.4.

Tied to the "separation" argument, and not too slyly, is an intimation that the courts would do well to stay out of this housing problem, for if the receivership meets with little more success than the current administration of BHA, then the courts will be substituted for BHA as the target of criticism; and the question is left not squarely stated but immanent whether that would be good for the courts. Amid these tears shed by anticipation for the courts, we acknowledge the possibility that a receivership will not succeed, but the facts of record suggest to us the certainty that the present administration has failed and would very probably continue to do so. It becomes a conscientious duty, within the law, even at the risk implied, to allow the receivership experiment to go forward as a last resort.

C. *Collateral Matters.* 1. *Claim of bias.* In the course of the proceedings, BHA made unsuccessful applications to the judge to disqualify himself, and to this court (under our superintendency power) to disqualify him, on the ground of his alleged bias. The grievance is renewed on this appeal as a reason for reversing the judgment. No doubt the judge in the course of the proceedings below formed a negative impression of BHA, that is, of members of its Board and of certain of its employees, based on his appraisal of their performance. But that is not a ground for the assertion of a disqualifying bias. See the discussion in *Lena* v. *Commonwealth*, 369 Mass. 571, 574-576 (1976). Nor is it a ground for demanding recusal that a judge in an equity cause expresses his views with a certain amount of vehemence. Here that vehemence undoubtedly was fueled, first, by the

judge's frustration at what he took to be the poor reaction of the BHA people to his orders and directions and latterly to the requirements of the consent decree, and, second, by his plain concern for the human beings affected by the litigation. We think the judge's indulgence in very emphatic criticism was not helpful and we suggest that that style of utterance should be abandoned for the future. But, upon consideration, the judge felt that he could maintain his impartiality and had done so, and we do not reach any contrary conclusion.

2. *"Ex parte" communications.* BHA also attacks the judgment on the ground that the judge on several occasions had conversations about the case outside the usual judicial setting where representatives of both sides are present. The judge was in constant touch with the master but we think it was understood, and was in fact provided in the consent decree itself (although not with entire clarity), that there could be private consultations between the judge and master. Indeed such an understood arrangement would seem natural against the background of the case. However the judge on several occasions also had conversations with BHA people (in the majority of instances the master was also present). In the absence of an understanding with the parties about such encounters, we think they should not have taken place. But the transgressions appear to us to have been unthinking rather than venal, and we do not believe they affected the substance of the proceedings one way or the other. To reverse the judgment on this account and reopen proceedings before a judge lacking the five years' experience would be a profligate waste of time and resources. Cf. *Bradley* v. *Milliken,* 426 F. Supp. 929, 939-940 (E.D. Mich. 1977).

We do not condone such communications, but the nature of the case suggests some palliation of the misbehavior. This was not a standard lawsuit. It was a massive, long-continuing litigation which has approximated the type involving institutional reform.

During the last few years a number of attempts have been made to catalogue the distinctive features of such cases.[37] The catalogues do not coincide at all points but we think they would agree that the judge tends to be more active in such proceedings and to use less formal procedures, especially after liability is found and remedial phases (including the phase of implementation) are reached. See *Inmates of the Suffolk County Jail* v. *Eisenstadt*, 518 F.2d 1241, 1243 (1st Cir. 1975); Coffin, The Frontier of Remedies: A Call for Exploration, 67 Calif. L. Rev. 983, 996 (1979) ("The specter of ex parte discussions or influence would not seem to be of as much concern at the remedial stage as when liability is at issue"). The extensive employment of parajudicial officers has been mentioned. Necessarily the judge becomes interested in operational problems and it is understandable that he should begin to act the part of an operator with perhaps reduced attention to such conventional procedural safeguards as bilaterality.

We say all this not to excuse the questioned communications here but to note the emergence of special problems that will call for study and solution if these large cases remain a feature of the legal scene, as they almost certainly will.[38] In the present case we trust the judge to take care to avoid the shoals and approach any similar procedural questions with thought and discretion after he receives the case on remand.

D. *Conclusion.* It is right and proper that BHA should be operated as the Legislature declared it should be. But there has been a breakdown, resulting in widespread violations of law by BHA, which necessitates and therefore must evoke extraordinary action. To say that this court has been most reluctant to approve the temporary receivership is to

---

[37] Coffin, The Frontier of Remedies: A Call for Exploration, 67 Calif. L. Rev. 983, 988-991 (1979). Chayes, The Role of the Judge in Public Law Litigation, 89 Harv. L. Rev. 1281, 1282-1284 (1976). Cf. Fiss, The Supreme Court, 1978 Term — Foreword: The Forms of Justice, 93 Harv. L. Rev. 1 (1979); Cox, The New Dimensions of Constitutional Adjudication, 51 Wash. L. Rev. 791 (1976).

[38] The Brakel article, cited in the text *supra*, appeals for such study.

understate the matter. No judge or court could enjoy the prospect of interfering with local authority and assuming a measure of supervision over a large outside enterprise, least of all one sliding downhill. Nevertheless the violations of law are there, and on the facts remedial efforts cannot stop short of receivership.

A receivership ought to be able to do a better job with the funds becoming available than has been done by BHA in the past, but we repeat what we said on the first appeal: inadequate funding will pose ultimately the cruelest of dilemmas affecting large numbers of Boston citizens (368 Mass. at 341-342). We can do no more than express the hope that the governmental sources which furnish funding, as well as those which provide services, will be sensitive to these consequences and give all feasible help to the receivership.[39]

The judgment is to be modified as indicated at point II B 3(d) above, and as so modified is affirmed.

*So ordered.*

### APPENDIX

General Laws c. 111, § 127H, as amended through St. 1978, c. 104, § 6, reads as follows:

"Any tenant who rents space in a building for residential purposes wherein a condition exists which is in violation of the standards of fitness for human habitation established under the state sanitary code or in violation of any board of health standards, which condition may endanger or

---

[39] There is perhaps an augury of solid cooperation with the receivership in the fact that the Executive Office of Communities and Development (speaking for DCA) in a letter of July 27, 1979, to the chairperson of BHA, ordered BHA not to expend funds from the State subsidy (or from the rents) for external legal services in pursuing an appeal from the judgment. Similarly HUD in a letter dated July 26, 1979, to the chairperson said that it would not concur in any request to pursue an appeal and that BHA was not allowed to use Federal funds for that purpose. It added: "I [regional adminstrator] urge the Authority to give its fullest support to the Court's Order and to the Receiver when he or she is appointed and I assure you that you can count on HUD's cooperation and support during this difficult period."

materially impair his health or well-being or the health or well-being of the public, may file a petition against the owner of said building to enforce the provisions of the said code in the superior court. Such petition shall set forth the violation of the state sanitary code or the rules and regulations of the board of health shall state that such condition may endanger or materially impair the health or well-being of any tenant therein; and that said condition was not substantially caused by the tenant or any other person acting under his control. The petition shall also state that the violation has been determined to exist by inspection of a board of health or, in the cities of Boston and Worcester, of the commissioner of housing inspection, or shall state that such inspection had been requested at least twenty-four hours prior to the filing of the petition and that there has been no inspection. Upon filing such a petition, process shall issue and be served, and a hearing shall be held as provided in section one hundred and twenty-seven D. At least seven days prior to any hearing the petitioner shall send by certified or registered mail a copy of the petition to all mortgagees and lienors of record, and shall notify them of the time and place of the hearing.

"The provisions of section one hundred and twenty-seven E shall apply in any such hearing.

"The court may:

"(a) issue appropriate restraining orders, preliminary injunctions and injunctions;

"(b) authorize any or all tenants in the respondent's building wherein the violation exists to pay the fair value of the use and occupation of the premises or such installments thereof from time to time as the court may direct to the clerk of the court in the same manner and subject to the same provisions as contained in section one hundred and twenty-seven F;

"(c) order all the tenants in the respondent's building wherein the violation exists to vacate the premises, and order the board of health to close up said premises; or

"(d) appoint a receiver.

"A copy of any order, finding or decree made by the court hereunder shall be forthwith sent by the clerk of the court to any mortgagee and lienor of record."